Michael Thomas WILSON,
Plaintiff–Appellee,

v.

Barry A. KITTOE, Defendant–
Appellant,

and

Anthony S. TOKACH, Defendant.

No. 02–7880.

United States Court of Appeals,
Fourth Circuit.

Argued: June 3, 2003.

Decided: July 22, 2003.

**ARGUED:** Alexander Francuzenko, O'Connell, O'Connell & Sarsfield, Rockville, Maryland, for Appellant. George Lynwood Freeman, Jr., Freeman & Berthelsen, Fairfax, Virginia, for Appellee.

Before MICHAEL, TRAXLER, and KING, Circuit Judges.

Affirmed by published opinion. Judge KING wrote the opinion, in which Judge MICHAEL and Judge TRAXLER joined.

## OPINION

KING, Circuit Judge:

This appeal arises from the April 1999 arrest of Michael Wilson outside of his home in Stephens City, Virginia. Wilson brought suit against the arresting officer and others, alleging, *inter alia*, a violation of his Fourth Amendment right against arrest in the absence of probable cause. The officer moved for summary judgment on grounds of qualified immunity, and the district court denied the motion. *Wilson v. Kittoe*, 229 F.Supp.2d 520, 538 (W.D.Va. 2002). The officer has appealed and, for the reasons explained below, we affirm.

### I.

At about 3:45 a.m. on April 14, 1999, Barry Kittoe, a Deputy Sheriff with the Frederick County Sheriff's Department, responded to a call from a dispatcher alerting him that a vehicle was being driv-

en erratically near Bel Haven Court in Stephens City, Virginia. When Kittoe arrived at the neighborhood in question, he observed from his police cruiser a vehicle being driven with its headlights turned off. Kittoe followed the vehicle into the driveway of 114 Farlawn Court.

Exiting his cruiser, Kittoe approached the driver's side of the suspect's vehicle and identified himself. The driver, later identified as Seth Woolever, was the vehicle's only occupant. When Woolever got out of the vehicle, Kittoe observed that he was having difficulty maintaining his balance and that he smelled strongly of alcohol. Woolever also had bloodshot eyes and his speech was slurred.

Meanwhile, Michael Wilson was awakened by what sounded like a car backfiring. After hearing the noise for the third time, Wilson got out of bed and looked out his bedroom window. He saw two cars pulling into the driveway of his next-door neighbors, the Woolevers, at 114 Farlawn Court. The second car idled in the driveway with its headlights on. Wilson dressed and went downstairs to investigate.

It was dark outside, so Wilson turned on his outside lights and walked out onto his driveway. From there, Wilson observed his neighbor's son, Seth Woolever, standing in the Woolever driveway in the custody of a police officer, who he later learned was Kittoe. Wilson believed that Woolever had already been placed in handcuffs, because Woolever's arms were down by his side. Wilson could tell that the officer was talking to Woolever, but the noise from the engine of the idling police cruiser, as well as the distance between Wilson's vantage point and the place where Woolever and the officer were standing (about fifty feet away, on the far side of the cruiser), made it difficult for Wilson to hear what was being said.

## A. *THE FIRST CONVERSATION*

Wilson stood in his driveway for a minute or two before Kittoe noticed him. Kittoe asked Wilson who he was, and Wilson replied that he lived next door. Kittoe then inquired whether it was Wilson who had called in the complaint about an erratic driver. When Wilson said no, Kittoe told Wilson to "get out of here" as he was "interfering with [the] investigation."

Wilson did not respond to Kittoe ("The First Refusal to Obey"). Instead, without approaching, Wilson asked Woolever if he was "okay." Woolever replied that he "wasn't sure." Wilson then asked Woolever if Woolever wanted Wilson to represent him, as Wilson was an attorney and had represented the Woolever family on prior occasions. Woolever responded, "I'll be looking at needing the services of an attorney" and "I want you to represent me."

## B. *THE SECOND CONVERSATION*

Still in his own driveway, Wilson once again addressed Kittoe, saying: "Officer, if you don't mind, when you finish doing whatever you're doing, I would like to speak with my client for a moment or two and give him one of my cards and I don't think he'll be wanting to answer any questions on advice of counsel." Kittoe responded that Wilson was interfering with his investigation, and he again told Wilson to leave. Wilson advised Kittoe that he would retrieve some identification from inside his house ("The Second Refusal to Obey"). Wilson then walked into his house, leaving the door open behind him.

## C. *THE THIRD CONVERSATION*

When Wilson returned a minute or two later with his wallet and card case, he observed that another police officer, who he later learned was Officer Timothy

Smedley, had arrived on the scene. Smedley had parked his cruiser in the street between Wilson's driveway and the Woolever driveway. Wilson proceeded down his driveway and approached Smedley, who was standing in the street next to his cruiser. Wilson neither approached nor spoke to Kittoe and Woolever, both of whom remained standing next to Kittoe's police cruiser in the Woolever driveway.

Wilson introduced himself to Smedley as a lawyer, and he handed Smedley one of his business cards. Wilson asked Smedley if he could speak to his client when the officers were finished with the arrest, but Smedley replied that he was just on the scene to assist, and that Kittoe was in charge. Wilson and Smedley then simply waited in the street next to Smedley's cruiser.

### D. *THE FOURTH CONVERSATION*

At this point, Kittoe left Woolever in handcuffs next to Kittoe's cruiser and walked down the Woolever driveway to where Wilson and Smedley stood in the street. Kittoe approached Wilson and again informed him that he was interfering with the investigation. Kittoe ordered Wilson to leave the area. Wilson told Kittoe that he understood that Kittoe "had a job to do," but that, as an attorney, "he had a job to do as well" ("The Third Refusal to Obey"). Wilson explained that he just wanted to speak to his client for a moment when Kittoe was finished doing "whatever it was" that he was doing. Then Wilson informed Kittoe that "any information" that Kittoe elicited from Woolever as a result of questioning "will be suppressed at trial under the Exclusionary Rule."

### E. *THE ARREST AND AFTERMATH*

Following this exchange, Kittoe paused momentarily and then informed Wilson that he was under arrest. Wilson was promptly handcuffed and placed in Smedley's cruiser. Soon thereafter, a third police vehicle, driven by Lieutenant Anthony Tokach, arrived on the scene. Tokach spoke briefly with Kittoe, and then with Smedley. Smedley then proceeded to the cruiser and offered to remove Wilson's handcuffs.

Wilson eventually was driven to the regional jail, where he was again handcuffed before being led inside. Once in the jail, Wilson's shirt and shoes were removed and he sat, handcuffed, until 6:30 in the morning. He was then issued a summons for a Class 2 misdemeanor violation of Virginia's obstruction of justice statute, Va.Code Ann. § 18.2–460(A), and was released. The Commonwealth's Attorney subsequently filed a *nolle prosequi* in the proceedings against Wilson.

### II.

On April 12, 2001, Wilson filed a complaint in the Western District of Virginia, asserting that Kittoe and Tokach violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights when they arrested and detained him in the early morning hours of April 14, 1999. Wilson seeks compensatory and punitive damages. On September 27, 2002, after discovery was complete, the defendants filed a motion for summary judgment on the basis of qualified immunity. On October 28, 2002, the district court held an in-chambers conference to discuss the motions. On November 7, 2002, the court denied the motion for summary judgment as to Kittoe and granted it as to Tokach. *Wilson*, 229 F.Supp.2d at 538. On December 2, 2002, Kittoe filed a timely notice of appeal. We possess jurisdiction pursuant to 28 U.S.C. § 1291 and the collateral order doctrine. *Mitchell v. For-*

*syth,* 472 U.S. 511, 528–30, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

### III.

■ We review de novo the district court's denial of qualified immunity, employing our full knowledge of our own and other relevant precedents. *Rogers v. Pendleton,* 249 F.3d 279, 285 (4th Cir.2001) (citing *Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994)). When considering an appeal of a denial of qualified immunity, we are required to consider the facts "in the light most favorable to the party asserting the injury." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official. *Gomez v. Toledo,* 446 U.S. 635, 640–41, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

■ A defendant is entitled to summary judgment on grounds of qualified immunity when there is no genuine issue of material fact, and when the undisputed facts establish that the defendant is entitled to judgment as a matter of law. *Pritchett v. Alford,* 973 F.2d 307, 313 (4th Cir.1992). We have emphasized the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial. *Id.* at 313; *see also Saucier,* 533 U.S. at 200, 121 S.Ct. 2151 ("Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." (internal quotation marks omitted)). However, we have also recognized that the qualified immunity question can be difficult for a court to resolve as a matter of law, as it can at times require "factual determinations respecting disputed aspects of [a defendant's] conduct." *Pritchett,* 973 F.2d at 312. The importance of summary judg-

ment in qualified immunity cases "does not mean ... that summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the defense, important as may be its early establishment." *Id.* at 313.

### IV.

■ Our qualified immunity analysis proceeds in two steps. First, we ask whether, "taken in the light most favorable to [Wilson,] the party asserting the injury, ... the facts alleged show [that Kittoe's] conduct violated a constitutional right." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Second, we ask whether the right alleged to have been violated was a "clearly established ... right[ ] of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("Qualified immunity is not lost when an officer violates the Fourth Amendment unless a reasonable officer would know that the specific conduct at issue was impermissible."). Only if we resolve both inquiries in the affirmative should we uphold a denial of qualified immunity.

### A.

Our first task is to assess whether the facts alleged, taken in the light most favorable to Wilson, indicate that Officer Kittoe had probable cause for Wilson's arrest. If probable cause was lacking, then Wilson has successfully asserted the violation of a constitutional right—specifically his Fourth Amendment right against unreasonable seizure—and we may move on to the second prong of our qualified immunity analysis.[1]

---

**1.** In his complaint, Wilson alleged that he was arrested and imprisoned in violation not only

■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. "An arrest is a seizure of the person," *Rogers,* 249 F.3d at 290, and, subject to limited exceptions not relevant here, "Fourth Amendment seizures are 'reasonable' only if based on probable cause," *Dunaway v. New York,* 442 U.S. 200, 213, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). An officer has probable cause for arrest when the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Pritchett,* 973 F.2d at 314. In determining whether probable cause exists in a given case, it is important to limit our consideration to only those "facts and circumstances known [to the officer] at the time of the arrest." *Smith v. Tolley,* 960 F.Supp. 977, 994 (E.D.Va. 1997); *see also Gooden v. Howard County,* 954 F.2d 960, 965 (4th Cir.1992) ("In cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place.").

Kittoe asserts that he had probable cause to arrest Wilson for obstruction of justice under Virginia Code § 18.2–460(A) (the "Obstruction Statute" or the "Statute"). At the time of the events in question, the Obstruction Statute provided:

> If any person without just cause knowingly obstructs ... any law-enforcement officer in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so by such ... law-enforcement officer, he shall be guilty of a Class 2 misdemeanor.

■ Va.Code § 18.2–460(A).[2] We note at the outset that the Statute contains two distinct prohibitions: under its terms, a person may neither (1) "without just cause knowingly obstruct[ ] ... any law-enforcement officer in the performance of his duties as such" (the "Obstruction Clause"), nor (2) "fail[ ] or refuse[ ] without just cause to cease such obstruction when requested to do so by such ... law-enforcement officer" (the "Refusal to Cease Clause"). Because the Refusal to Cease Clause presupposes the occurrence of an obstruction, Kittoe had probable cause to arrest under the Refusal to Cease Clause only if he *already* had probable cause to arrest pursuant to the Obstruction Clause. Thus, it is the Obstruction Clause that is the primary focus of our analysis: for Kittoe to have had probable cause for Wil-

of his Fourth Amendment rights, but of his rights under the Fifth, Sixth, and Fourteenth Amendments as well. However, in denying Kittoe the protection of qualified immunity, the district court focused solely on Wilson's claim that he was arrested in the absence of probable cause, in violation of the Fourth Amendment. *Wilson,* 229 F.Supp.2d at 526. Because Kittoe has chosen to assert on appeal only that the court erred in its substantive analysis of the Fourth Amendment, and because Kittoe makes no argument for the proposition that the court should have awarded him summary judgment with respect to Wilson's other constitutional claims, we too limit

our review to the Fourth Amendment issue. *Cf. Gomez,* 446 U.S. at 640–41, 100 S.Ct. 1920 (holding that defendant official bears burden of proof and persuasion with respect to claim of qualified immunity). Accordingly, we express no opinion as to the propriety of the court's failure to parse the complaint and entertain the possibility of qualified immunity with respect to Wilson's other claims.

2. The Statute was amended in 2002 to change "Class 2 misdemeanor" to "Class 1 misdemeanor."

son's arrest, the facts and circumstances must have warranted a reasonable belief that Wilson was, or was on the verge of, unlawfully obstructing Kittoe in the performance of his duties. *Pritchett*, 973 F.2d at 314.

Kittoe points to two forms of obstruction, each of which, he asserts, generated probable cause for Wilson's arrest: (1) Wilson's verbal criticism of Kittoe and his offer of legal services to Woolever during Woolever's arrest (the four "Conversations"); and (2) Wilson's refusal to leave the area and thereby cease the obstruction (the three "Refusals to Obey"). Like the district court, we shall address, in turn, first the four Conversations, and then the three Refusals to Obey.

### 1. *The Four Conversations*

■■■■■■ At four distinct instances, Wilson engaged Kittoe in conversation in a manner that, Kittoe alleges, violated the Obstruction Statute. On its face, the Statute does appear to reach mere speech, as its terms broadly prohibit any "obstruction" of an officer. Va.Code § 18.2–460(A); *see also Smith*, 960 F.Supp. at 995 (holding Obstruction Statute does not require that there be actual physical assault on officer as predicate for liability). The Virginia courts, however, have subjected the Statute to a limiting construction, under which a person must do more than merely render an arrest more difficult or inconvenient than it might otherwise have

been—by, for example, speaking to an officer as he works—in order to be criminally liable.[3] *Ruckman v. Commonwealth*, 28 Va.App. 428, 505 S.E.2d 388, 389 (1998) ("As the Supreme Court [of Virginia] has held, and as the plain language of the statute states, obstruction of justice does not occur when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult but does not impede or prevent the officer from performing that task."). And, of course, we defer to the interpretation of the Obstruction Statute that the Virginia courts have rendered. *See Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000) (per curiam) ("As a general rule, this Court defers to a state court's interpretation of a state statute.").

The stringent definition of obstruction that appears in *Ruckman* is nothing new to Virginia's jurisprudence: as early as 1925, the Supreme Court of Virginia held that "[t]o constitute an obstruction ... there must be acts clearly indicating an intention on the part of the accused *to prevent* the officer from performing his duty.... [There must be an intent] to obstruct the officer himself not merely to oppose or impede the process with which the officer is armed." *Jones v. Commonwealth*, 141 Va. 471, 126 S.E. 74, 77 (1925) (emphasis added) (interpreting "obstruction" as used in similar Virginia obstruc-

---

**3.** Peaceful verbal criticism of an officer who is making an arrest cannot be targeted under a general obstruction of justice statute such as Virginia's without running afoul of the First Amendment: "The Constitution does not allow such speech to be made a crime. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principle characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63, 107 S.Ct. 2502, 96

L.Ed.2d 398 (1987) (striking down municipal ordinance that made it illegal to "in any manner oppose, molest, abuse, or interrupt any policeman in the execution of his duty" as unconstitutionally overbroad under the First Amendment). However, because Virginia has interpreted its Obstruction Statute such that the Statute does not reach peaceful verbal criticism, we need not address whether, absent this interpretation, the Statute might be constitutionally infirm.

tion statute); *cf. Marttila v. City of Lynchburg,* 33 Va.App. 592, 535 S.E.2d 693, 698–99 (Va.App.2000) (holding that to refer to officers as "f* * *ing pigs" and "f* * *ing jokes" during arrest does not constitute breach of peace (alteration added)). We have acknowledged the distinction that the Virginia courts have long drawn between conduct that merely impedes or frustrates the officer, which does not ground liability under the Obstruction Statute, and conduct that intentionally thwarts or prevents an arrest, which does. *See Rogers,* 249 F.3d at 291 (reviewing cases).

Construing the facts, as we must, in the light most favorable to Wilson, the "facts and circumstances within [Kittoe's] knowledge" were *not* "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that [Wilson] ha[d] committed, [was] committing, or [was] about to" violate the Obstruction Statute when Wilson four times engaged Kittoe in conversation. *Pritchett,* 973 F.2d at 314. Wilson (1) inquired into the well-being of his neighbor's son and offered his legal services; inquired (2) of Kittoe and (3) of Smedley whether he could talk with Woolever for a few moments once they were finished with the arrest; and (4) peacefully attempted to remind Kittoe of Woolever's constitutional rights. None of those four Conversations could justify Kittoe in the belief that Wilson was attempting to prevent him from carrying out the arrest, as the Obstruction Statute requires. In fact, Wilson expressly stated that he was content to wait to speak with Woolever until *after* the arrest was complete. Under these circumstances, Kittoe lacked probable cause to believe that Wilson was in violation of Virginia Code § 18.2–460(A).

### 2. *The Three Refusals to Obey*

■ Kittoe next contends that he had probable cause to arrest Wilson under the Obstruction Statute because Wilson three times refused to obey a direct order to leave the scene. The first time he gave the order, Wilson was standing in his driveway approximately fifty feet away. The second time, Wilson had just inquired into Woolever's well-being and had asked Kittoe if, after the officer had completed his work, Wilson might speak with Woolever. And the third time, Wilson was standing out by the street speaking with Smedley.

■ As noted above, the Refusal to Obey Clause of the Obstruction Statute is tied to the Obstruction Clause: an individual can be held liable for "refus[ing] without just cause to cease such obstruction when requested to do so" only if he has already been engaging in "such obstruction." Va.Code. § 18.2–460(A). And he has been engaging in "such obstruction" only if he has, as the Obstruction Clause provides, "without just cause knowingly obstruct[ed] . . . any law-enforcement officer in the performance of his duties." *Id.* Thus, it is not just any refusal to obey an officer's orders that can render an individual liable under the Obstruction Statute. There can be probable cause to believe that a person is violating the Statute by refusing to obey an order only if (1) there is probable cause to believe the individual had been obstructing, and (2) the order that the individual refused to obey was an order to cease that obstruction.

Kittoe's orders to Wilson were orders that Wilson leave the scene. When Kittoe made those orders, though, Kittoe did not have probable cause to believe that Wilson was engaging in obstruction. The orders came during the First, Second, and Fourth Conversations. But, as discussed above, Kittoe did not have probable cause to believe that Wilson was engaging in obstruc-

tion when he conversed with the officers. Because there was no probable cause to believe that Wilson was engaging in obstruction simply by being there and conversing with the officers, there could be no probable cause to believe that Wilson violated the Obstruction Statute when he refused to obey Kittoe's order that he cease and leave. While it may be inconvenient to a police officer for a neighbor to stand nearby and watch from his driveway as the officer works, inconvenience cannot, taken alone, justify an arrest under the Obstruction Statute.

Kittoe asserts that our recent decision in *Figg v. Schroeder*, 312 F.3d 625 (4th Cir. 2002), establishes that Kittoe had probable cause to arrest Wilson as soon as Wilson failed to obey an order at a crime scene. Appellant's Br. at 28. We disagree. In *Figg*, a deputy sheriff had shot and killed Thomas Figg, after stopping Figg in the middle of the night on suspicion of drunken driving at the entrance to the Figg family farm. *Figg*, 312 F.3d at 631. The deputy called for backup support, and the officers who responded knew only that shots had been fired; they were unaware that the deputy had been the only shooter. *Id.* Immediately upon their arrival at the Figgs' farm, the officers were confronted in quick succession by four individuals, each of whom they detained. *Id.* at 632. The second of these arrivals was Martha Figg Williams, who drove to the scene from the Figg home, about a quarter of a mile up the driveway. When Williams subsequently challenged her detention under the Fourth Amendment, we concluded that the police would have had probable cause to arrest her under the Obstruction

Statute for refusing to obey an officer's order.[4]

Whereas Williams's belligerent actions combined with seemingly hazardous circumstances to give the officers in *Figg* probable cause to believe that Williams intended to obstruct their work, the same cannot be said with respect to the circumstances here. In *Figg*, Williams arrived on the scene violently agitated and verbally abusive. *See id.; cf. City of Houston v. Hill*, 482 U.S. 451, 463, 107 S.Ct. 2502, 96 L.Ed.2d 398 (noting that "[t]he freedom verbally to challenge police action is not without limits"). She physically encroached upon a nascent police investigation into a minutes-old shooting, all the while "yelling and cursing." *See Figg*, 312 F.3d at 632. It was undisputed that the scene appeared highly volatile, with uncertain numbers of justifiably angry, potentially hostile, and likely armed individuals in the immediate vicinity. *See id.* at 631–32 ("When [the] officers began to arrive on the scene, [the deputy] told them only that shots had been fired; they did not know that [the deputy] was the only shooter."); *id.* at 631 n. 2 ("[The farm on which the shooting occurred] was known to members of the Sheriff's Department as the home of the Figg family, and the family had a reputation for domestic violence, hard drinking, fighting, and possession of firearms (including pistols, rifles, shotguns, and semiautomatic weapons).... Because of the Figgs' violent reputation, the [local police] had an unwritten policy of calling for backup support before responding to a call from the Figgs."). While the benefit of hindsight might have allowed us to paint

---

**4.** As we recounted in *Figg*, even construing all disputed facts in favor of the plaintiff, it appeared that "[w]hen Ms. Williams arrived on the scene, a deputy ordered her to stay in her car, but she disobeyed, and she got out of her car yelling and cursing. Ms. Williams was ordered to return to her car, but she refused. Sergeant Anthony then placed her face-front against the car and attempted to handcuff her. Ms. Williams struggled, but she was handcuffed." 312 F.3d at 632.

a different picture, we focused our probable cause analysis on the scene as it appeared to the officers when they chose to detain Williams, *see id.* at 636 (emphasizing that proper focus of probable cause inquiry is upon those facts known to arresting officer at time of arrest) (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)), and held that "she could lawfully be placed under arrest" for violation of the Obstruction Statute, *id.* at 637.

Here, by contrast, Wilson was at all times composed, polite, and circumspect; he remained at a distance, on his own driveway or out in the street with Smedley, and never attempted to approach either Kittoe or Woolever; and, far from attempting "to prevent [Kittoe] from performing his duty," *Jones,* 126 S.E. at 77, Wilson made it clear to Kittoe that he would remain at a distance until Kittoe had finished his work and had given him permission to confer with Woolever. Furthermore, and importantly, there is no evidence that the scene appeared to Kittoe to be anything other than highly secure: There was a single calm, handcuffed suspect, and a backup officer was present. The officers had no apparent reason to believe or even suspect that, aside from Woolever and Wilson, there was anyone else around; much less did they have reason to expect that unseen persons lurking nearby would be angry, drunk, and/or armed. In fact, Kittoe even felt sufficiently comfortable with the circumstances to *leave* Woolever by his police cruiser when he walked down to speak with Wilson and Smedley. In short, while Williams's actions in *Figg,* considered in the highly volatile context in which they occurred, were sufficient to give the responding officers probable cause to arrest her for obstruction, neither comparable conduct nor comparable circumstances exist in this case. Lacking probable cause to believe

that Wilson was engaging in obstruction by being present and engaging Kittoe in the four Conversations, Kittoe also lacked probable cause to believe that Wilson violated the Statute when he refused to obey Kittoe's order that he leave.

### 3. Conclusion

Because the facts, taken in the light most favorable to Wilson, show that Kittoe lacked probable cause to believe that Wilson was in violation of the Obstruction Statute when Wilson engaged Kittoe in conversation and refused to obey Kittoe's orders to cease and depart, Wilson has alleged a violation of his Fourth Amendment right against arrest in the absence of probable cause.

### B.

 Under the second prong of our qualified immunity analysis, we must determine whether the right alleged to have been violated was a "clearly established . . . right[ ] of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. A right is "clearly established" if a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right. *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The inquiry is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances. *Milstead v. Kibler,* 243 F.3d 157, 161 (4th Cir.), *cert. denied,* 534 U.S. 888, 122 S.Ct. 199, 151 L.Ed.2d 141 (2001). "In determining whether a right was clearly established at the time of the claimed violation, 'courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and

the highest court of the state in which the case arose.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir.1999) (quoting *Jean v. Collins*, 155 F.3d 701, 709 (4th Cir.1998) (en banc)) (alteration in original). However, "the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity." *Id.* After all, "qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations." *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir.2001) (Michael, J., concurring); *see also Wilson*, 526 U.S. at 615, 119 S.Ct. 1692 (1999) (holding that right can be deemed clearly established even if there is no prior decision addressing precise conduct at issue, so long as its illegality would have been evident to reasonable officer on basis of existing caselaw). Nonetheless, when the legality of a particular course of action is open to reasonable dispute, an officer is not liable: under the doctrine of qualified immunity, "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993).

■ In deciding whether the right alleged to have been violated was clearly established, the right must be defined "at a high level of particularity." *Edwards*, 178 F.3d at 250–51. Defining the right at issue with the requisite level of particularity, we agree with the district court that the appropriate question is whether, at the time of Kittoe's actions on April 14, 1999, it was clearly established that a police officer may not arrest a third party for criticizing the officer's conduct and refusing to leave the scene of an arrest.

■ We conclude that that right *was* clearly established at the time of Wilson's

arrest: a reasonable Virginia police officer in Kittoe's position would have understood that, as "obstruction" has long been circumscribed in Virginia law, the four Conversations and the three Refusals to Obey could not generate probable cause for arrest under the Obstruction Statute. Conduct such as Wilson's would not "warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit [a violation of the Statute]." *Pritchett*, 973 F.2d at 314.

Prior to Kittoe's encounter with Wilson, Virginia courts had consistently interpreted the Commonwealth's Obstruction Statute to place beyond the Statute's reach conduct that was merely harassing or irritating to an arresting officer. *See, e.g., Ruckman*, 505 S.E.2d at 389 (citing *Jones* in holding that individual must actually "impede or prevent the officer from performing [his] task," and not "merely render[ ] the officer's task more difficult," in order to be criminally liable under Obstruction Statute); *see also Jones*, 126 S.E. at 77 (interpreting "obstruction" in earlier statute to require that defendant not merely "impose or impede" an officer, but rather that he actually intend "to prevent the officer from performing his duty"); *see generally Rogers*, 249 F.3d at 291 (reviewing Virginia's longstanding interpretation of "obstruction" in its criminal obstruction of justice statutes). Relevant precedent had also previously rendered unmistakable the constitutional fallibility of obstruction statutes that were given broader interpretations. *See, e.g., Hill*, 482 U.S. at 462–63, 107 S.Ct. 2502 (striking down municipal ordinance that made illegal to "in any manner oppose, molest, abuse, or interrupt any policeman in the execution of his duty" as unconstitutionally overbroad under the First Amendment); *Brooks v. N.C. Dep't*

*of Corr.*, 984 F.Supp. 940, 961 (E.D.N.C. 1997) (vacating conviction under North Carolina's virtually identical obstruction statute—under circumstances virtually identical to those here—as violative of First and Fourteenth Amendments). Together, these decisions provided Virginia officers, like Kittoe, fair notice that the inconvenient presence and conversation of a spectator such as Wilson does not provide probable cause for arrest pursuant to the Obstruction Statute.

### V.

For the foregoing reasons, Wilson has alleged the violation of a clearly established Fourth Amendment right. Accordingly, the district court's denial of qualified immunity is affirmed.

*AFFIRMED*