**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1521

LAUREN GRAHAM,

Plaintiff - Appellant,

v.

C. GAGNON; JANNIE CLIPP,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T. S. Ellis, III, Senior District Judge.  (1:14-cv-00872-TSE-TCB)

Argued:  May 11, 2016                    Decided:  July 27, 2016

Before MOTZ and FLOYD, Circuit Judges, and DAVIS, Senior Circuit Judge.

Reversed and remanded by published opinion.  Judge Floyd wrote the opinion, in which Judge Motz and Senior Judge Davis concurred.

Victor M. Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellant.  Julia Bougie Judkins, BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C., Fairfax, Virginia, for Appellees.

FLOYD, Circuit Judge:

Appellant Lauren Graham was arrested for obstruction of justice. The obstruction charge was ultimately dismissed and her record expunged. Graham subsequently filed a civil lawsuit against the police officers responsible for her arrest, alleging that the officers violated her Fourth Amendment rights by arresting her without probable cause. Following discovery, the officers moved for summary judgment, arguing that they were entitled to qualified immunity. The district court granted the officers' motion, and Graham appealed. Because we conclude that it would have been clear to reasonable officers in Appellees' position that they lacked probable cause to arrest Graham, we reverse the grant of summary judgment and remand.

I.

The facts underlying this appeal are drawn from the summary judgment record made after discovery in the district court and are presented here in the light most favorable to Graham, the non-moving party. See, e.g., Merchant v. Bauer, 677 F.3d 656, 658 n.1 (4th Cir. 2012).

A.

At about 10:30 p.m. on September 16, 2012, Mitchell Lee Cannon called the Falls Church, Virginia, Police Department

(FCPD) to report an assault. Cannon was leaving a convenience store when he encountered Colby Twinam, a male in his early twenties, in the parking lot. Apparently still harboring a grudge from high school, Twinam punched Cannon in the back of the head. Cannon pushed Twinam away and retreated behind his car. Twinam taunted Cannon, broke Cannon's car antenna, and then ran off.

FCPD officer Clark Gagnon responded to Cannon's assault report. After interviewing Cannon, Gagnon obtained an arrest warrant for Twinam for assault and destruction of property. Based on a records check, Gagnon learned that Twinam had prior arrests in 2007 and 2008 for destruction of property and possession of marijuana. FCPD records indicated that Twinam's address was 205 Grove Avenue in Falls Church. Gagnon radioed other on-duty FCPD officers to request assistance in arresting Twinam; FCPD officers Jannie Clipp and Alan Freed each responded that they would assist.

Both Clipp and Freed arrived at the house at 205 Grove Avenue before Gagnon, a few minutes after midnight. Clipp proceeded to the front door; Freed went to the side of the house where steps led up to a covered porch and a side door. Freed encountered Twinam, who was sitting on the side porch steps. After ascertaining Twinam's identity, Freed told him that they had a warrant for his arrest. Twinam responded by running into

2

the house and shutting and locking the side door. Twinam shouted "Mom, the cops are here"! J.A. 460. Clipp (at the front door) and Freed (at the side door) began knocking loudly and ringing the doorbell.

### B.

Graham, Twinam's 56-year-old mother, had been asleep upstairs and was awakened by the commotion. She "grabbed a robe," J.A. 52, and came downstairs to find "a lot of pounding and yelling" at the front door as well as "pounding" at the side door. J.A. 53. The family dog was "at this point barking crazily." J.A. 54. She did not open the side door, but proceeded to the front door in the living room. Graham opened the front door, which consisted of both a main wooden door and a storm door on an air pump.

Clipp told Graham that they had a warrant and were there to arrest Twinam. Graham asked to see the warrant and Clipp told her that the officers did not have the warrant with them. At some point Freed joined Clipp at the front door; both officers told Graham that she needed to produce Twinam to be taken into custody. Graham said, "[L]et me speak with my son," J.A. 77, and left the doorway to go find him. Clipp, following standard practice, placed her foot in the doorway; the storm door,

closing automatically on the air pump, "then came in contact with [her] foot." J.A. 28, 82.

Graham found her son, Twinam, in the kitchen, talking to his girlfriend on his cellphone. The kitchen was not visible from the front door. Twinam was apparently asking his girlfriend whether he ought to try and run for it. Graham said: "[W]hy would you do that? That's just dumb." J.A. 69. She told Twinam, "[Y]ou need to come now, you need to cooperate. I don't know what the issue is but you've got to go." J.A. 71.

At some point while Graham was in the kitchen, Gagnon arrived at the house and joined Clipp and Freed at the front door. Graham returned to the front door and told the officers that "[she] was talking to [her son] and trying to get him to come out." J.A. 73. At some point Graham's fiancé, Richard Lilitch, who had also been asleep upstairs, came downstairs to the living room.

Graham and Lilitch returned to the kitchen and convinced Twinam to go out to the police officers. The most direct route from the kitchen to the living room passed through a pantry area. The pantry had doggie gates at either end to pen in the family dog. Twinam stepped over the first gate, followed by Graham and then Lilitch. As Twinam stepped over the second gate, he came into view of the officers at the front door. Gagnon and Freed entered the house and grabbed Twinam; in the

4

process, Twinam and Freed tripped on the doggie gate and wound up on the floor. The officers handcuffed Twinam and took him into custody. About six or seven minutes had elapsed since Graham had been awakened from her sleep.

## C.

Gagnon took Twinam to the city detention center for booking and turned him over to the sheriff. Gagnon then went to the duty magistrate and applied for an arrest warrant for Graham. Gagnon sought to arrest Graham for obstruction of justice under Virginia Code § 18.2-460(A). The Virginia statute provides: "If any person without just cause knowingly obstructs . . . any law-enforcement officer . . . in the performance of his duties as such . . . he shall be guilty of a Class 1 misdemeanor." Id. The magistrate denied the warrant application.

## D.

The three FCPD officers' next shift together was a couple days later. At roll call, Gagnon told Clipp and Freed that the magistrate had denied his request for an arrest warrant for Graham. Clipp expressed surprise, telling Gagnon that Graham "pretty much tried to shut the door on [me] and actually hit [me] with the door." J.A. 164. Gagnon had not previously been aware of this information: he had not arrived at Graham's house

by that point and neither Clipp nor Freed had reported it over the radio.

Gagnon went before the duty magistrate, a different individual than the magistrate who had denied his first warrant request. Gagnon told the second magistrate that he had previously been denied an arrest warrant, but informed the magistrate that he had learned new information. Gagnon told the second magistrate "something like" "Ms. Graham had shut the door on Officer Clipp's foot." J.A. 170-71. The second magistrate authorized an arrest warrant for Graham.

Gagnon arrested Graham outside her home on September 20, 2012. She was brought before a magistrate and released on personal recognizance. The charge was later dismissed with prejudice and the record of her arrest expunged.

E.

About a year later, Graham filed an administrative complaint with the FCPD. The complaint was investigated by an internal affairs officer, who interviewed the officers involved and issued a recommendation against further action. The FCPD Chief, Mary Gavin, conveyed this conclusion to Graham in a letter dated November 8, 2013. Gavin told Graham that "[t]he incident involved an arrest situation of an individual that was evading arrest in your residence. The officers were reacting to

6

a situation that was becoming increasingly difficult because of your actions." J.A. 27.

Graham subsequently filed suit against Gagnon and Clipp pursuant to 42 U.S.C. § 1983. She alleged that the officers violated her Fourth Amendment rights by arresting her without probable cause to suspect she had violated Virginia's obstruction statute. The district court oversaw discovery, after which the parties cross-moved for summary judgment. Graham argued that on any view of the facts it was objectively unreasonable for an officer to conclude there was probable cause to arrest her. The officers contended the opposite and asserted that they were protected by qualified immunity.

The district court found that nothing in the record rebutted "the presumption of reasonableness that attends the issuance of a warrant by a neutral magistrate." J.A. 465. The district court further found that:

> [I]t cannot be said on this record that the magistrate was so obviously in error that any reasonable officer would have recognized the error. . . . There is a continuum of behavior from mere passive lack of cooperation to active attempts to prevent an arrest and it is the magistrate's responsibility to determine whether or not the facts and circumstances reported to her fall on the probable cause side of this continuum. . . .
>
> The events at the Twinam/Graham residence were not so clearly passive noncooperation that no reasonably competent officer would have concluded that a warrant should issue. . . . Defendants, it appears, believed that when plaintiff left the front door to speak with

7

her son in the kitchen she was openly encouraging her son not to cooperate with [them] and come out of the house. Given the officers' inability to see or hear plaintiff's conversation, the magistrate's decision was not so obviously in error that defendants should be liable for failing to question her judgment.

J.A. 467-68 (citations omitted). The district court accordingly granted the officers' summary judgment motion on the basis of qualified immunity and denied Graham's cross-motion as moot. Graham timely appealed.

## II.

Whether a party is entitled to summary judgment is a question of law we review de novo. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The district court's grant of summary judgment to the officers was appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to Graham, no material facts were disputed and the officers were entitled to qualified immunity as a matter of law. See id.

## III.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

8

known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In practical effect, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012) (citation omitted). This allowance for reasonable mistakes is the product of "balanc[ing] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

The shield of qualified immunity is lost when a government official (1) violates a constitutional right and (2) that right was clearly established. See, e.g., Merchant, 677 F.3d at 661. The right at issue here is not the general right to be free from arrest without probable cause, but rather the right to be free from arrest under the particular circumstances of the case. See, e.g., Pritchett v. Alford, 973 F.2d 307, 313-14 (4th Cir. 1992).[1] The appellee officers lose the shield of qualified

---

[1] Framing the right as the general right to be free from arrest without probable cause would frustrate the purpose of qualified immunity. It is clearly established that the Fourth Amendment prohibits police officers from arresting individuals without probable cause. See, e.g., McAfee v. Boczar, 738 F.3d 81, 87 (4th Cir. 2013); Miller v. Prince George's Cty., 475 F.3d 621, 627 (4th Cir. 2007). But framing the right at that level (Continued)

immunity if it would have been clear to reasonable officers in their position that they lacked probable cause to arrest Graham for violating Virginia's obstruction of justice statute. See id. In other words, the officers' immunity turns on the "objective legal reasonableness" of their conclusion that there was probable cause to arrest Graham. See Messerschmidt, 132 S. Ct. at 1245.

IV.

Graham argues that it was objectively unreasonable for Gagnon and Clipp to conclude there was probable cause to arrest her. Therefore, Graham argues, the district court erred in holding that the officers were entitled to qualified immunity. We agree.

A.

Before evaluating the reasonableness of the officers' probable cause determination, we first clarify the effect of the

---

of generality would mean that the "clearly established" prong would automatically be met in every suit alleging an arrest without probable cause. The immunity analysis would then turn solely on whether the officer correctly concluded that probable cause existed, eliminating the "breathing room" to make reasonable mistakes. Qualified immunity does not shield officials from liability for all of their mistakes, but it does shield them when their mistakes were reasonable.

arrest warrant. The officers make much of the fact that Gagnon obtained—at least the second time he asked—an arrest warrant from a neutral magistrate. However, an arresting officer is not automatically immunized from suit merely because the officer successfully requested an arrest warrant first.

"[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner . . . . [but] the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." Messerschmidt, 132 S. Ct. at 1245.[2] For example, a warrant will not preclude a civil suit when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." Id. (quoting Malley, 475 U.S. at 341). The Malley Court explained:

> [I]t goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable. But it is different if no officer of reasonable competence would have requested the warrant, i.e., his request is outside the range of the

---

[2] Messerschmidt was a search, vice seizure, case, but the same standard is applicable in both contexts. See, e.g., Messerschmidt, 132 S. Ct. at 1245 n.1 (explaining that "the same standard of objective reasonableness" applied in suppression-hearing cases "defines the qualified immunity accorded an officer who obtained or relied on an allegedly invalid warrant" and citing Malley v. Briggs, 475 U.S. 335, 344 (1986), an arrest case).

11

> professional competence expected of an officer. If the magistrate issues the warrant in such a case, his action is not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty. The officer then cannot excuse his own default by pointing to the greater incompetence of the magistrate.

475 U.S. at 346 n.9.[3] Consistent with Malley and Messerschmidt, we have repeatedly held that arrest warrants do not confer immunity if it was objectively unreasonable to conclude there was probable cause for the arrest. See, e.g., Merchant, 677 F.3d at 665-66; McAfee, 738 F.3d at 87. Accordingly, if the officers' decision to request a warrant for Graham's arrest was outside the range of professional competence expected of an officer—that is, if it was objectively unreasonable to conclude there was probable cause that Graham violated Virginia's obstruction statute—then the officers are not immune from suit.

---

[3] The Malley Court also stated that "[i]t is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination." Malley, 475 U.S. at 346 n.9 (citation omitted). Malley does not clarify the effect on qualified immunity when that presumption is rebutted. As the district court noted, in Virginia "magistrates need not be members of the bar or trained lawyers." J.A. 464 n.4 (citing the Supreme Court of Virginia's Magistrate Manual). The record does not disclose the identity of the magistrates involved in this case, but we need not decide whether the Malley presumption holds as our conclusion here does not turn on the magistrates' qualifications. We therefore presume that the magistrates were in fact more qualified than the officers to make a probable cause determination.

B.

We now turn to the reasonableness of the officers' probable cause determination. As we explained above, if a police officer incorrectly determines that probable cause existed, the officer does not necessarily lose the protection of qualified immunity. If the probable cause determination, though mistaken, was nevertheless objectively reasonable, the officer should enjoy immunity. However, where the officer's mistake was objectively unreasonable, the officer may be subject to civil liability.

It is impossible to determine whether a probable cause determination was mistaken—and, if so, whether such a mistake was reasonable—without an understanding of what would constitute probable cause under the circumstances. "Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." Pritchett, 973 F.2d at 314; see also, e.g., McAfee, 738 F.3d at 87; Sevigny v. Dicksey, 846 F.2d 953, 956-57 (4th Cir. 1988). Thus, we ask: (1) what did Clipp and Gagnon know of Graham's conduct?; and (2) what are the contours of the conduct proscribed by Virginia's obstruction statute? By comparing Graham's known conduct to the conduct proscribed by the Virginia statute, we can then assess the reasonableness of the officers' decision to seek Graham's arrest.

13

1.

In determining what conduct of Graham's was known to the officers, we consider only "information actually possessed by the officer[s] at the critical time, or that was then reasonably available to [them], and in light of any exigencies of time and circumstance that reasonably may have affected the officer[s'] perceptions." Pritchett, 973 F.2d at 312 (citations omitted). In other words, we do not impute factual knowledge to the officers that they did not have or that was not reasonably available to them. Facts may later be discovered that would have made it clear to the officers that no crime had been committed; but, if those facts were not known or reasonably available to the officers before the arrest, we do not include those facts in the qualified immunity calculus.

We are mindful, however, that this case is before us on the officers' summary judgment motion. We therefore take the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to Graham. Henry, 652 F.3d at 531. We have explained that "[t]he importance of summary judgment in qualified immunity cases 'does not mean . . . that summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the defense.'" Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003) (quoting Pritchett, 973 F.2d at 313).

14

The operation of these principles to the record here is straightforward: the officers are assumed to have possessed the information they would have had if events unfolded as Graham asserts. For example, the parties dispute the time that elapsed from Graham being awakened until Twinam was in custody: the officers assert it was approximately 15-20 minutes while Graham puts the length of her involvement on the order of 6-7 minutes. Compare Appellees' Br. 8, with Appellant's Br. 15-16. On the officers' summary judgment motion, we assume Graham's version of the timeline.[4] We thus assume that the officers' "actually possessed" the information that the total time of Graham's involvement was no more than about seven minutes.

The factual version of events we laid out early in the opinion is Graham's version. This is the version from which the officers are assumed to have gathered the information they could use to determine whether there was probable cause that Graham

---

[4] "[W]hen documentary evidence 'blatantly contradict[s]' a [party's] account 'so that no reasonable jury could believe it,' a court should not credit [that party's] version on summary judgment." Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276-77 (4th Cir. 2011) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). The record includes recordings of the officers' radio communications on the night of Twinam's arrest. The log of those recordings is time-stamped and thus enables at least a partial reconstruction of the timing of events. Having reviewed these recordings, we observe that the recordings are consistent with—rather than contradictory to—Graham's timeline. The time stamps cast serious doubt on the viability of the officers' account of the time.

had committed a crime. However, not every fact in Graham's account of the evening is assumed to have been possessed by the officers. For example, on summary judgment we accept Graham's assertion that, while in her kitchen, she was encouraging her son to cooperate and surrender himself. But the kitchen was out of sight and earshot of the officers at the front door. It would thus be inappropriate to assume the officers "actually possessed" the details of that conversation. Put another way, even assuming events unfolded as Graham asserts, the officers would still not have "actually possessed" information about a conversation they were not in a position to hear.

The district court correctly did not charge the officers with knowledge of that conversation. However, rather than simply leaving the content of the conversation out of the analysis, the district court instead improperly credited the officers' subjective beliefs about what might have been happening in Graham's kitchen. The district court stated, "[The officers], it appears, believed that when [Graham] left the front door to speak with her son in the kitchen she was openly encouraging her son not to cooperate with them and come out of the house." J.A. 468 (citation omitted). We have repeatedly explained that an officer's subjective belief is not legally relevant to the probable cause analysis. "Because probable cause is an objective test, we examine the facts within the

16

knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; we do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998) (collecting cases); cf. Henry, 652 F.3d at 535 ("[O]ur Court has consistently conducted an objective analysis of qualified immunity claims and stressed that an officer's subjective intent or beliefs play no role.").

The officers could still have incorporated a suspicion that Graham was encouraging her son to flee into their probable cause calculation if it was objectively reasonable to suspect so—that is, if a person "of reasonable caution . . . [would] believ[e] [it], in the circumstances." See Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). Here, however, the officers do not point to any factual circumstance that would make a person of reasonable caution believe Graham was inciting her son to flight. For summary judgment purposes: (1) Graham told the officers, "[L]et me speak with my son and get him," J.A. 77; (2) Graham walked into the house and then returned within a minute or so, telling the officers that she "was talking to [her son] and trying to get him to come out," J.A. 73; and (3) Graham again walked into the house and within another minute or so her son was walking into view of the officers at the front door where he was taken

17

into custody.  J.A. 74.  These facts are not flatly incompatible with a reality in which Graham was in the kitchen encouraging her son to flee arrest:  Graham could have been repeatedly lying to the officers, and her sagacious son might have decided to give himself up against the advice of his mother.  But if the officers believed that Graham was encouraging Twinam to flee,[5] that belief was, at best, a hunch, and "a mere hunch that illegal activity is afoot . . . [is not] probable cause."  Doe v. Broderick, 225 F.3d 440, 452 (4th Cir. 2000) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).[6]

---

[5] We find it difficult to reconcile such a belief with the actions of the officers here.  If the officers believed Graham was actively encouraging her son to flee arrest, it strikes us as odd that they would not, at the very least, have asked her to stop doing so when she returned to the front door.  Any number of other actions, such as, for example, having one of the three officers watch the back door, might also have been consistent with a belief that a footrace was imminent.

[6] Even if Graham had been suggesting her son leg it out the back door, it is not at all clear that such encouragement would have put Graham in violation of the Virginia obstruction statute.  In Atkins v. Commonwealth, police officers were attempting to detain Atkins on suspicion of stealing a car.  678 S.E.2d 834, 835 (Va. Ct. App. 2009).  Atkins fled from the officers into nearby woods, where he eluded capture for four hours.  Id.  The Virginia Court of Appeals held that these facts were legally insufficient to establish obstruction under Virginia Code § 18.2-460(A).  Id.  If actual flight is not obstruction, it would be odd if suggested flight was.

18

2.

We turn now to the contours of the conduct proscribed by the Virginia obstruction statute. The statute under which Graham was arrested states: "If any person without just cause knowingly obstructs . . . any law-enforcement officer . . . in the performance of his duties as such . . . he shall be guilty of a Class 1 misdemeanor." Va. Code Ann. § 18.2-460(A). This sparse language could be read in the first instance to proscribe a wide ambit of conduct, although we would still struggle to fit Graham's conduct within that ambit. At an absolute minimum, something she did must have "obstructed" an attempted action of one of the officers. We cannot find in the record any attempted action by the officers that could be said to have been "obstructed" by Graham, and the officers' brief and oral argument are likewise missing even a suggested action that was actually obstructed.

Regardless, we are not the first court to read this statute. Both the Virginia courts and this Court have applied the statute many times before, and there is a small mountain of caselaw that makes clear that whatever the outer boundary of Virginia Code § 18.2-460(A), Graham came nowhere near it. In Wilson, we explained that "[t]he Virginia courts . . . have subjected the Statute to a limiting construction, under which a person must do more than merely render an arrest more difficult

19

or inconvenient than it might otherwise have been . . . in order to be criminally liable." 337 F.3d at 399 (citing Ruckman v. Commonwealth, 505 S.E.2d 388, 389 (Va. Ct. App. 1998)). We further explained that "[t]he stringent definition of obstruction that appears in Ruckman is nothing new to Virginia's jurisprudence," and we continued by noting that "[w]e have acknowledged the distinction that the Virginia courts have long drawn between conduct that merely impedes or frustrates the officer, which does not ground liability under the Obstruction Statute, and conduct that intentionally thwarts or prevents an arrest, which does." Id. at 399-400 (citing Rogers v. Pendleton, 249 F.3d 279, 291 (4th Cir. 2001)); accord, e.g., Jordan v. Commonwealth, 643 S.E.2d 166, 171 (Va. 2007). Graham did not thwart or prevent Twinam's arrest; it is far from apparent that she impeded or frustrated it either. Under Virginia law, it is clear there was no probable cause to arrest Graham for obstruction of justice.

The officers advance the idea that Graham was less than fully cooperative or that her actions made their task more difficult. This was exactly the theory conveyed to Graham by the FCPD Chief after Graham complained about the officers' actions; Chief Gavin explained to Graham that Gavin felt her officers were right to arrest Graham because they "were reacting to a situation that was becoming increasingly difficult because

20

of your actions." J.A. 27. Even if Graham did make things more difficult,[7] it is beyond debate that such conduct does not fall within Virginia's obstruction statute: "[Section] 18.2–460(A) requires 'actual hindrance or obstruction of the officer,' 'opposition or resistance by direct action.' '[O]bstruction of justice does not occur when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult' or 'frustrate[s] [his or her] investigation.'" Rogers, 249 F.3d at 291 (quoting Polk v. Commonwealth, 358 S.E.2d 770, 772–73 (Va. Ct. App. 1987), and Ruckman, 505 S.E.2d at 389, 390). It is objectively unreasonable to conclude anything other than that Graham's conduct fell well outside the Virginia statute. Accord, e.g., Kee v. City of Hampton, No. 2597-08-1, 2009 WL 3734053, at *3

---

[7] The officers do not make clear what about Graham's conduct made the arrest more difficult. At oral argument, counsel for the officers suggested that it would have been unproblematic had Graham simply stayed in bed rather than coming downstairs and opening the front door. It seems extremely unlikely that Graham's actual conduct in coming downstairs did not make Twinam's arrest at least marginally less difficult for the officers than had she put in earplugs and kept snoozing. Regardless, once she opened the door and the officers asked her to produce her son, it is unclear what the officers expected her to do. Graham was about 56 years old and Twinam was about 21. The officers could not have reasonably expected Graham to physically wrestle her son to the front door. Graham was left to the power of her persuasion, a power she successfully used to compel her son into custody within a matter of minutes. Graham's conduct strikes us as about as helpful as could be expected.

(Va. Ct. App. Nov. 10, 2009) ("[A]ppellant, by initially not allowing the police officer into his house, merely made the [domestic abuse] investigation more difficult by failing to cooperate with the officer. There was no direct act by appellant to resist the officer. Courts have repeatedly held that such indirect acts are not enough to constitute obstruction." (collecting cases)).

The district court acknowledged some of these cases in a footnote. It further acknowledged Graham's argument that those cases establish that the facts here did not amount to probable cause, and characterized that argument as "not plainly insubstantial." J.A. 466-67. The district court nevertheless found the officers were entitled to qualified immunity after concluding, essentially, that the officers' mistake was reasonable. It was not.

The district court summarized Virginia law thusly: "Mere passive lack of cooperation does not constitute probable cause, whereas active refusal to cooperate, including making active efforts to prevent the arrest from taking place, clearly may amount to obstruction." J.A. 467. Even if this statement correctly characterized Virginia law, we think it would still be objectively unreasonable to conclude Graham made "active efforts to prevent the arrest from taking place." But it does not correctly characterize Virginia law. As just one example,

<u>Atkins</u> held that a suspect who flees officers attempting to detain him, and then hides out in the woods for four hours evading the officers, cannot be convicted under the obstruction statute. 678 S.E.2d at 835. Atkins's actions appear to fall squarely at the "active efforts" end of the district court's obstruction continuum, but such actions have been clearly held to fall outside the statute.

The district court's formulation also strikes us as unworkable in practice. If an individual refuses to open her front door to officers attempting to investigate, is the individual "passively not opening the door" or "actively refusing to cooperate"? <u>Cf.</u> <u>Kee</u>, 2009 WL 3734053, at *3. These difficulties are illustrated by Appellees' contention at oral argument that Graham could not have been arrested had she stayed upstairs and refused to open the door, a set of circumstances that we think would have made Twinam's arrest more difficult than what actually occurred. Courts, however, need not struggle with the semantics of "activity" and "passivity"; as we explained earlier, obstruction under the Virginia statute does not turn on such characterizations.

Finally, we address the officers' contention that "Graham's argument that she did not obstruct justice under Virginia Code § 18.2-460, and that there was no probable cause for her arrest under that statute, is irrelevant." Appellees' Br. 15. It is

23

true that an actual lack of probable cause is not <u>dispositive</u> for qualified immunity purposes; qualified immunity protects officers who make mistakes if those mistakes are reasonable. But the officers' contention misses the point. The boundaries of the statute are extremely relevant to an assessment of whether a mistake was reasonable.

The officers' misconception may explain why they cite next to no cases discussing the substantive scope of the Virginia statute. The officers cite <u>Polk</u> for the proposition that "an offender need not actually obstruct an officer to be guilty of obstruction of justice—an offender's mere attempt to do so constitutes a substantive offense." Appellees' Br. 28. As an initial matter—and as the officers acknowledge—<u>Polk</u> was applying a different statute that criminalized "attempt[ing] to intimidate or impede a . . . law-enforcement officer" "by threats, or force." <u>See</u> 358 S.E.2d at 771 n.1. It is unclear what support the officers seek from <u>Polk</u>, but the court there specifically contrasted the threats statute with other Virginia statutes—such as the one at issue here—"requiring actual 'obstruction.'" <u>Id.</u> at 772-773.

If the officers are suggesting that Graham obstructed justice in the same manner as Polk—i.e., verbally—they are mistaken. Polk was convicted under the threats statute after repeatedly threatening to kill his arresting officer. <u>Id.</u> at

24

771. Graham was arrested pursuant to the obstruction statute, and there is no contention that her verbal interaction with the officers was anything other than peaceful. As we have explained:

> Peaceful verbal criticism of an officer who is making an arrest cannot be targeted under a general obstruction of justice statute such as Virginia's without running afoul of the First Amendment: "The Constitution does not allow such speech to be made a crime. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."

Wilson, 337 F.3d at 399 n.3 (quoting City of Houston v. Hill, 482 U.S. 451, 462–63 (1987)). We therefore reject any contention that Graham's arrest might have been justified by non-violent criticism of the officers.


3.

Numerous decisions of the Virginia courts and this Court provide guidance on the scope of Virginia Code § 18.2-460(A). There are undoubtedly still gray areas at the statute's boundaries, meaning that officers enforcing it will at times face close cases. This was not one of those cases. Given Graham's known conduct, it would have been clear to reasonable officers in Appellees' position that they lacked probable cause to arrest Graham for obstruction of justice. We therefore

25

reverse the district court's grant of summary judgment to Gagnon and Clipp.

V.

Graham asks us to direct the district court to enter summary judgment for her and to remand solely for a determination of damages. Graham argues that if we find the officers clearly violated her constitutional rights, there are no remaining liability issues to try. The problem with this argument is that we concluded the officers clearly violated her rights when the disputed facts are viewed in the light most favorable to her. Graham is entitled to summary judgment only if the same conclusion obtains when viewing the facts in the light most favorable to the arresting officers. Henry, 652 F.3d at 531. The district court did not rule on the merits of Graham's motion. J.A. 468. Under the circumstances, it is appropriate to remand the case for the district court to consider her motion—under the correct legal standards explained above—in the first instance.

VI.

Finally, we return to the officers' oft-repeated argument that "it was reasonable for them to rely on the magistrate's finding of probable cause and issuance of an arrest warrant."

26

E.g., Appellees' Br. 30-31. We have already explained why it was unreasonable to do so here. But their argument also elides the fact that the officers received guidance from another magistrate. That magistrate, to whom Gagnon first applied, denied the warrant application, J.A. 462, thus putting the officers on notice that probable cause was lacking.

The district court observed that, unlike federal law, "Virginia law does not require officers seeking arrest warrants to do so by way of written declarations or sworn affidavits," J.A. 466 n.6 (citing Va. Code Ann. § 19.2-72), and that "[n]o written record of the facts presented to the magistrates exists here." Id. Graham suggests that Gagnon was only able to obtain a warrant from the second magistrate by misleading the magistrate about the events of that night. The district court correctly noted that the record does not contain any evidence of false statements on Gagnon's part. Of course, with no requirement that warrant applications be recorded, how could it?

We have assumed that Gagnon fairly presented the facts to both magistrates. If that was indeed the case, the second warrant application would have been identical to the first, with the exception that Gagnon could have also recounted the additional fact of the storm door closing. As to the door closing, this is how Clipp described it during her deposition:

27

Q. Did [Graham] attempt to force the door—to push your foot with the door notwithstanding your having told her that she needed to keep the door closed (sic)?

A. No.[8]

. . . .

Q. Your foot was not injured by the door touching it, was it?

A. No.

Q. No. Was the shoe scuffed?

A. No. I mean, I didn't inspect it after that; but . . . it wasn't anything significant.

J.A. 240-41, 254.

Having been told by the initial magistrate that there was no probable cause to arrest Graham, the officers must have concluded the door-closing tipped the probable cause scales.

We find it hard to take this very seriously.

\* \* \* \* \*

---

[8] The FCPD Chief had apparently been given a different impression. At her deposition, Chief Gavin testified:

A. I – as far as [Graham's] action[] was, as I understood, was pushing the door back onto Officer Clipp's foot.
Q. Is that the screen door that closed on her foot?
A. I believe so.

J.A. 422.

28

For the reasons above, we reverse the district court's grant of summary judgment to Appellees and remand.

<u>REVERSED AND REMANDED</u>