**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1845**

TIFFANIE HUPP; R.H., a minor, by and through his next friend, Tiffanie Hupp;
CLIFFORD MYERS,

     Plaintiffs – Appellants,

  v.

STATE TROOPER SETH COOK; COLONEL C.R. JAY SMITHERS,

     Defendants – Appellees,

 and

WEST VIRGINIA STATE POLICE,

     Defendant.

Appeal from the United States District Court for the Southern District of West Virginia,
at Charleston.  Thomas E. Johnston, Chief District Judge.  (2:17–cv–00926)

Argued:  April 2, 2019        Decided:  July 25, 2019

Before GREGORY, Chief Judge, and KING, Circuit Judge.[1]

Affirmed in part, reversed in part, and remanded by published opinion.  Chief Judge
Gregory wrote the opinion, in which Judge King joined.

---

   [1] Judge Thacker was unable to participate in oral argument.  The decision is filed
by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

**ARGUED**:     John Eric Campbell, CAMPBELL LAW, Denver, Colorado; Justin F. Marceau, UNIVERSITY OF DENVER, Denver, Colorado, for Appellants. Michael Deering Mullins, STEPTOE & JOHNSON PLLC, Charleston, West Virginia, for Appellees.  **ON BRIEF:** Alene Anello, ALDF, Cotati, California, for Appellants. Robert L. Bailey, STEPTOE & JOHNSON PLLC, Charleston, West Virginia, for Appellees.

GREGORY, Chief Judge:

Appellant Tiffanie Hupp was arrested for obstruction when she attempted to stop a state trooper from shooting her family's dog. After her husband video-recorded the incident, the state trooper entered the family's home, without consent and without a warrant, and seized several of the family's electronic devices. Hupp, her minor son, and her father-in-law filed suit against the state trooper, asserting various violations of the Fourth Amendment under 42 U.S.C. § 1983. The district court granted summary judgment to the state trooper and denied Appellants' motion for partial summary judgment. Because issues of fact exist, we affirm the denial of Appellants' partial summary judgment motion but reverse the grant of summary judgment in Trooper Seth Cook's favor and remand for trial on each of Appellants' claims.

I.

A.

Buddy, a 13-year-old husky-Akita mix, lives with his owner, Appellant Clifford Myers, in Waverly, West Virginia. Buddy has been the source of contention between Myers and his neighbor David Wayne, who lives across the street.

On May 9, 2015, the police were called out in response to a dispute earlier that day between the two men over the dog. West Virginia State Troopers Seth Cook and Sean Michael responded to the call. Trooper Cook was there to provide backup to Trooper Michael. Upon their arrival, the troopers spoke with Myers, who was in his front yard drinking a beer. The troopers then went across the street to speak with the Waynes. In

3

speaking with the Waynes, Trooper Cook was told of the "ongoing problem" with Myers over Buddy, that Buddy was, in their mind, "vicious and had killed several of their cats and had chased the children." J.A. 302. Trooper Cook was also told that Buddy had chased Wayne's grandmother back into the house and that Wayne's grandfather had to take a stick with him when he checked the mail "to shoo the dog away." *Id.*[2]

At the time, Myers had another dog, a black Labrador, on a chain in his front yard; Buddy was loose in the yard. According to Myers, Trooper Cook was aware that Buddy was not on a leash. Trooper Cook testified, however, that he did not see Buddy when he first went to speak with Myers. While the troopers spoke with the Waynes, Myers took the Labrador off the chain and placed the chain on Buddy. Myers later explained that it was mere happenstance that he switched the dogs; according to him, it was not because "the black lab was the friendlier of the two dogs." J.A. 82.

After speaking with the Waynes, the troopers returned to Myers's house. Trooper Michael asked Myers for his identification. Myers asked his daughter, Lindsey, to retrieve it for him. As Lindsey headed back toward the house to retrieve the ID, Trooper Cook followed her into Myers's front yard. Trooper Cook testified that he followed Lindsey "because of the people gathering in the door [of Myers's home] and just a general, again, situation awareness." J.A. 208. At that point, Myers had six of his family members at his house, and Trooper Cook wanted to "have a little bit of personal contact with them to, again, determine their nature" and determine if "there were potential other

_____

[2] Myers maintained that Buddy had never harmed a person and simply chased squirrels.

people that [he] needed to be paying closer attention to." J.A. 56, 207–08. Trooper Cook also testified that, due to the slope of Myers's front yard, he wanted to "get closer to where [he] could see better than from down at the road in the driveway looking up at a position of tactical advantage over [him]." J.A. 208.

Video evidence captured much, but not all, of what happened next.[3] A dog barked as Trooper Cook walked into Myers's yard. J.A. 610 at 1:17–1:20. Trooper Cook, who was trained to identify and "handle" aggressive dogs, took a few steps back after seeing Buddy. J.A. 189, 610 at 1:20–1:22. He then pulled his gun out and, holding it with his left hand, pointed it at Buddy. J.A. 610 at 1:23–1:26. Hupp, Myers's 113-pound daughter-in-law, ran down the front yard from near the house toward Trooper Cook. *Id.* at 1:26–1:27. She stood with her left side next to Trooper Cook's right side, her body perpendicular to Trooper Cook. Buddy was at Hupp's right. Hupp's arms were at her side and her hands were visibly empty. *Id.* at 1:26–1:28. Within seconds of Hupp's arrival, Trooper Cook grabbed Hupp's left arm with his right hand. *Id.* at 1:29. A brief struggle ensued during which Trooper Cook turned to his left, Hupp moved to her right and directly facing Trooper Cook, all while the two struggled for two seconds with Trooper Cook's grasp on Hupp's arm. *Id.* at 1:29–1:30. As Trooper Cook and Hupp spun around, Hupp fell to the ground. *Id.* at 1:31. When Hupp stood up, Trooper Cook

---

[3] To the extent the video depicts material facts of this case, we review those facts as they are depicted in the video. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Where, however, the video "does not 'clearly' or 'blatantly' contradict" Hupp's version of the facts, we adopt her version in reviewing the grant of summary judgment to Trooper Cook. *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276–77 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378).

5

grabbed her arms from behind and walked her to the police car parked a few feet away. *Id.* at 1:34–39. Bending Hupp over the hood of the police car, the troopers handcuffed her. *Id.* at 1:40–2:05.

Though not depicted clearly in the video, Trooper Cook testified that after seeing Buddy as he entered the yard, he yelled for someone to control the dog or to "get a hold of your dog." J.A. 201, 569–70. According to Trooper Cook, he did not at first notice that Buddy was on a chain. Hupp testified that she ran toward Trooper Cook both in response to Buddy's barks but also in response to the trooper's order to control the dog.

Also not clear from the video is what was said by Trooper Cook and Hupp in their brief encounter. Trooper Cook testified that he told Hupp at least twice to back away and that her response was that he could not tell her what to do on her property. Trooper Cook also maintained that Hupp was "cursing" and "screaming profanities" at him. J.A. 210, 509. Hupp testified, on the other hand, that she did not hear any of Trooper Cook's orders and simply told him, "Whoa, whoa, don't do that, stop." J.A. 121.

Hupp's husband, Ryan, recorded the incident with his cell phone from inside Myers's home. As Hupp was being arrested, she asked Ryan, "Did you get that on video?" J.A. 86. Ryan answered, "Don't worry, babe. I've got that shit." J.A. 244. Trooper Cook later testified that he understood that statement to mean that Ryan "was glad he had" the video and "wouldn't get rid of it for his—his possession of it." J.A. 247.

Upon learning that a video had been recorded, Trooper Cook "stepped in" to Myers's home without a warrant and without consent. J.A. 237, 258. He seized four electronic devices: a child's tablet and three cell phones, including Ryan's phone that

6

recorded the incident. J.A. 237, 572.[4] Trooper Cook explained in his deposition that it is his practice to seize electronic recording devices without first obtaining a warrant if he believes that someone has used the device to capture evidence. The State Police retained the devices for a month before returning them.

B.

Hupp was charged with obstruction under West Virginia Code § 61-5-17(a). She was arraigned, and after the magistrate judge concluded that probable cause existed for her arrest, she was released on bond. Following a jury trial in the Wood County magistrate court, Hupp was acquitted.

Appellants Hupp, Myers, and Hupp's minor son—who witnessed his mother's arrest—filed suit against Trooper Cook, West Virginia State Police Colonel C.R. "Jay" Smithers (the superintendent), and the West Virginia State Police. Appellants brought several claims for violation of their constitutional rights under 42 U.S.C. § 1983 and parallel state law claims. Appellants later amended their complaint, bringing claims against the police officers in their individual and official capacities and against the West Virginia State Police. The district court granted in part a motion to dismiss, dismissing the claims against the West Virginia State Police and those brought against the police officers in their official capacities. As a result, claims remained against only Trooper Cook and Colonel Smithers in their individual capacities. The claims against Trooper Cook included section 1983 claims for false arrest, excessive force, malicious

---

[4] Trooper Cook testified that after he "took the phones," Ryan and Tiffanie Hupp gave him the passwords for the phones and signed a property receipt. J.A. 572–73.

prosecution, unlawful search of Myers's house, unlawful seizure of the electronic devices, and unlawful seizure of Buddy; and state law claims for malicious prosecution, intentional infliction of emotional distress (outrage), and battery. A claim for supervisory liability under section 1983 also remained against Colonel Smithers.

Trooper Cook and Colonel Smithers moved for summary judgment on all of the remaining claims, and Appellants moved for partial summary judgment on the false arrest, excessive force, and unlawful search and seizure claims. The district court granted summary judgment to Trooper Cook and Colonel Smithers and denied summary judgment to Appellants. The district court found that Trooper Cook is entitled to qualified immunity on the false arrest, excessive force, and malicious prosecution claims brought under section 1983 as well as on the common law malicious prosecution claim. The district court granted summary judgment to Trooper Cook on the outrage and battery claims as well. Because the court found that Trooper Cook did not violate Hupp's constitutional rights, it granted summary judgment to Colonel Smithers on the one remaining claim of supervisory liability against him.

The district court also granted summary judgment to Trooper Cook on the unlawful search and seizure claims. The court concluded that exigent circumstances justified the search of Myers's home and the seizure of the electronic devices because an objectively reasonable officer would have believed that Myers's family members would destroy or conceal the video evidence before a warrant could be obtained. With respect to the claim of unlawful seizure of Buddy, the court found that Trooper Cook's actions

8

did not "meaningfully interfere[ ]" with Appellants' "possessory interest in Buddy." J.A. 636.

Appellants timely appealed the grant of summary judgment on the claims for false arrest, excessive force, malicious prosecution, unlawful entry, and unlawful seizure of the electronic devices. Appellants also appealed the denial of summary judgment in their favor on the Fourth Amendment claims related to the entry of Myers's home and seizure of the electronic devices. Appellants did not appeal the grant of summary judgment on the supervisory liability claim, claim for unlawful seizure of Buddy, or the state law claims of outrage and battery.

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367, and we have jurisdiction under 28 U.S.C. § 1291.

II.

We review a district court's grant of summary judgment de novo, "applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 208 (4th Cir. 2017) (quoting *T-Mobile Ne., LLC v. City Council of Newport News*, 674 F.3d 380, 384–85 (4th Cir. 2012)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)

9

(quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.

### A.

We first address the district court's determination that Trooper Cook is entitled to qualified immunity on the claims for false arrest, excessive force, and malicious prosecution. "The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate clearly established constitutional or other rights that a reasonable officer would have known." *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018). The doctrine is intended to "balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal quotation marks and citation omitted).

An official is not entitled to qualified immunity if he or she deprived an individual of a constitutional right and that right was clearly established at the time of the violation. *Pearson*, 555 U.S. at 231. Our analysis is, therefore, two-fold. We must determine

10

whether the facts, viewed in the light most favorable to Appellants, show that Trooper Cook violated Appellants' constitutional or other rights and whether those rights were clearly established at the time of Trooper Cook's conduct such that a reasonable officer would have known that the conduct was unconstitutional. *Smith*, 781 F.3d at 100. We may consider either prong of the analysis first. *Sims*, 885 F.3d at 260. The question of whether a right is clearly established is a question of law for the Court to decide. *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). The question of whether a reasonable officer would have known that the conduct at issue violated that right, on the other hand, cannot be decided on summary judgment if disputes of the historical facts exist. *Smith*, 781 F.3d at 100. Thus, "while the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (alteration and omission in original) (quoting *Pritchett*, 973 F.2d at 313).

### 1. False Arrest

We begin with Hupp's false arrest claim. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure is unreasonable under the Fourth Amendment if it is not based on probable cause. *Dunaway v. New York*, 442 U.S. 200, 213 (1979). Thus, "[i]f a person is arrested when no reasonable officer could believe . . . that probable cause exists to arrest that person, a violation of a clearly established Fourth

11

Amendment right to be arrested only upon probable cause ensues." *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001) (citation omitted).

The district court determined that a reasonable officer would have believed that probable cause existed for Hupp's arrest for obstruction. Appellants, on the other hand, contend that the historical facts material to a probable cause finding are in dispute. "Probable cause is determined by a 'totality-of-the-circumstances' approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). The inquiry "turns on two factors:  'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Id.* (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). While we look to the information available to the officer on the scene at the time, we apply an objective test to determine whether a reasonably prudent officer with that information would have thought that probable cause existed for the arrest. *Graham*, 831 F.3d at 185. Evidence sufficient to secure a conviction is not required, but probable cause exists only if there is sufficient evidence on which a reasonable officer at the time could have believed that probable cause existed for the arrest. *Wong Sun v. United States*, 371 U.S. 471, 479 (1963).

Because the probable cause inquiry is informed by the "contours of the offense" at issue, we are guided by West Virginia law in determining the scope of the offense of obstruction proscribed by West Virginia Code § 61-5-17(a)—the offense for which Hupp was arrested. *Rogers*, 249 F.3d at 291; *see Graham*, 831 F.3d at 188 (Although "an actual lack of probable cause is not *dispositive* for qualified immunity purposes[,] . . . [t]he boundaries of the statute [allegedly violated by the plaintiff] are extremely relevant

12

to an assessment of whether [an officer's] mistake was reasonable."). The plain language of the statute establishes that a person is guilty of obstruction when she, "by threats, menaces, acts or otherwise forcibly or illegally hinders or obstructs or attempts to hinder or obstruct a law-enforcement officer, probation officer or parole officer acting in his or her official capacity." W. Va. Code § 61-5-17(a).

Interpreting this statute, the Supreme Court of Appeals of West Virginia has held that a person is guilty of obstruction when she "check[s] or hamper[s] the action of the officer," does "something which hinders or prevents or tends to prevent the performance of [the officer's] legal duty," or acts in "direct or indirect opposition or resistance to the lawful discharge of [the officer's] official duty." *State v. Johnson*, 59 S.E.2d 485, 487 (W. Va. 1950). As West Virginia's high court has "succinct[ly]" explained, to secure a conviction under section 61-5-17(a), the State must show "forcible or illegal conduct that interferes with a police officer's discharge of official duties." *State v. Davis*, 735 S.E.2d 570, 573 (W. Va. 2012) (quoting *State v. Carney*, 663 S.E.2d 606, 611 (2008)). Because conduct can obstruct an officer if it is either forcible or illegal, a person may be guilty of obstruction "whether or not force be actually present." *Johnson*, 59 S.E.2d at 487. However, where "force is not involved to effect an obstruction," the resulting obstruction itself is insufficient to establish the illegality required by section 61-5-17. *Carney*, 663 S.E.2d at 611. That is, when force is not used, obstruction lies only where an illegal act is performed. This is because "lawful conduct is not sufficient to establish the statutory offense." *Id.*

13

Of particular relevance to our inquiry here, West Virginia courts have held that "when done in an orderly manner, merely questioning or remonstrating with an officer while he or she is performing his or her duty, does not ordinarily constitute the offense of obstructing an officer." *State v. Srnsky*, 582 S.E.2d 859, 867 (W. Va. 2003) (quoting *State ex rel. Wilmoth v. Gustke*, 373 S.E.2d 484, 486 (W. Va. 1988)). For example, the Supreme Court of Appeals has found that no obstruction is committed when a property owner asks a law enforcement officer, "without the use of fighting or insulting words or other opprobrious language and without forcible or other illegal hindrance," to leave her property. *Wilmoth*, 373 S.E.2d at 487. This principle is based on the First Amendment "right to question or challenge the authority of a police officer, provided that fighting words or other opprobrious language is not used." *Id.*; *see Graham*, 831 F.3d at 188 ("Peaceful verbal criticism of an officer who is making an arrest cannot be targeted under a general obstruction of justice statute . . . without running afoul of the First Amendment." (citation omitted)).

On the other hand, certain "threats, language, and menacing demeanor" can constitute obstruction. *State v. Davis*, 483 S.E.2d 84, 87 (W. Va. 1996). In *Davis*, for example, a police officer responded to a call of shots fired and encountered an intoxicated man who was fighting with his live-in girlfriend. *Id.* The man told the officer that he had a loaded shotgun in the corner of the home, "gestured toward the gun, reminded the officer in a threatening manner that it was loaded, and employed language indicative of both his agitated state and his intention to discharge the gun at any time and any place he chose." *Id.* The police officer exited the home and was forced to call for backup. *Id.* at

14

86. The court concluded that the "verbal threats and behavior" "had the effect of hindering the police investigation of shots [ ] fired." *Id.* at 87.

With respect to conduct that involves more than mere verbal interactions with law enforcement, obstruction may be found when a person refuses to comply with an officer's order. For example, the Supreme Court of Appeals of West Virginia upheld a conviction for obstruction where the defendant was told that he was being placed under arrest and then "struggled against arrest." *State v. Forsythe*, 460 S.E.2d 742, 745–46 (W. Va. 1995). More recently, the court upheld a conviction for obstruction where the defendant refused to obey a state trooper's numerous orders to stand to be frisked, began a physical altercation with the trooper, and ultimately grabbed the trooper's baton and struck the trooper twice on the head. *State v. Lowery*, No. 17-0210, 2018 WL 2193241, at *1, 5 (W. Va. May 14, 2018) (unpublished).

Applying these principles here, we find that disputes of fact preclude a finding that a reasonable officer in Trooper Cook's position would have believed that probable cause existed for Hupp's arrest. Trooper Cook maintains that Hupp's obstruction began when she approached him in "an aggressive manner" and continued as she failed to comply with his orders and "met [Trooper Cook's order] with a verbal further noncompliance." J.A. 210. First, disputes of fact exist with respect to Hupp's verbal interaction with Trooper Cook. The video evidence shows Hupp running toward Trooper Cook, with her arms to her side and her hands empty, after he pulled a gun on her father-in-law's dog.

15

She testified that she said only "Whoa, whoa, don't do that, stop." J.A. 121–22.[5] Even if Trooper Cook's testimony is to be believed—that Hupp told him that he could not tell her what to do on her property—such language is a challenge to the trooper's authority and does not constitute the type of menacing language found be to obstructionist in *Davis*. The parties dispute, however, whether Hupp also cursed at Trooper Cook when she approached him. *Compare* J.A. 210 (Trooper Cook's testimony that Hupp was "screaming profanities" at him) *and* J.A. 509 (criminal complaint describing Hupp as "cursing"), *with* J.A. 122 (Hupp's testimony that "[t]here was no cussing") *and* J.A. 140 (Dalton's testimony that Hupp was not cursing). While a reasonable jury could credit Trooper Cook's version of the interaction, it could instead believe Hupp that no "fighting or insulting words or other opprobrious language" were used. *Wilmoth*, 373 S.E.2d at 487.

Disputes of fact also exist with respect to Hupp's alleged failure to comply with Trooper Cook's order to step aside. *See Lowery*, 2018 WL 2193241, at *5. Trooper Cook testified that he gave at least two orders to Hupp to step back, with which she refused to comply. J.A. 570. Specifically, he testified that he told Hupp to "step back"; that Hupp responded, "You can't tell me to f-ing do that"; that he then told Hupp, "Ma'am, I'm not asking you; I'm telling you. Step back"; and that Hupp was "coming back with her opinions and why she's not going to comply." J.A. 215. The defense's

---

[5] The video does not contain clear audio of the incident. Therefore, we must look to the parties' respective deposition testimony and other evidence in the record regarding what was said.

16

expert described *three* orders for Hupp to step back. J.A. 443.[6] Hupp, on the other hand, testified that her only words to Trooper Cook were, "Whoa, whoa, don't do that, stop" and that she "didn't get a chance to hear" any of Trooper Cook's orders. J.A. 121–22. Trooper Cook even acknowledged that Hupp had only "a split second to comply" with his order before he grabbed her arm. J.A. 604. Clearly, there is a dispute as to whether Hupp refused to comply with Trooper Cook's orders or was even given the opportunity to comply with them before she was arrested mere seconds later.

Indeed, there is evidence to suggest that, rather than defying Trooper Cook's order to step back, Hupp was actually acting to comply with his earlier order to restrain Buddy. Hupp testified in deposition that she approached Trooper Cook and Buddy partly in response to Trooper Cook's undisputed command to "get control of the dog" or "get a hold of your dog." J.A. 121, 201, 569–70. Although Trooper Cook testified that Hupp began to obstruct him when she approached him in an "aggressive manner," J.A. 209–10, Trooper Michael testified that Hupp's "coming down the hill" toward Trooper Cook and Buddy after Trooper Cook's command to control Buddy "could be viewed as complying with his request," J.A. 316.

On this disputed evidence, we cannot conclude that a reasonable officer in Trooper Cook's position would have believed that probable cause existed for Hupp's arrest. With

---

[6] All of these orders, and Hupp's responses and "opinions," are alleged to have been spoken in the incredibly short period of two seconds. Such a back-and-forth exchange would seem to require more than two seconds. At this stage, however, like the district court, we make no determination regarding the credibility of Trooper Cook's testimony.

17

the facts viewed in the light most favorable to Hupp, the record shows that she ran to Trooper Cook to comply with his order to have Buddy controlled. Her arms were down at her side and her hands visibly empty. She told Trooper Cook to stop but did not curse at him. Yet a mere second or two later, before she heard any order to move, Trooper Cook grabbed her arm and flung her to the ground. Such facts do not reasonably support a charge of obstruction under West Virginia law. Accordingly, we reverse the grant of summary judgment on the false arrest claim.[7]

## 2. Excessive Force

Turning to Hupp's excessive force claim, we also conclude that the district court erred in granting summary judgment to Trooper Cook on qualified immunity grounds. The Fourth Amendment prohibits police officers from "using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003); *Graham v. Connor*, 490 U.S. 386, 395 (1989). Rather, police officers are constitutionally permitted to use only that force which is reasonable under the circumstances.

---

[7] Appellants presented expert reports and deposition testimony from two expert witnesses, an expert in canine behavior and an expert in police training. Appellants argue that the expert testimony establishes the unreasonableness of Trooper Cook's actions in the way in which he approached Buddy and drew his gun. According to Appellants, the district court's failure to engage with any of their proffered expert testimony constitutes reversible error in itself. As we have explained, the district court's grant of qualified immunity on the false arrest claim is reversed for reasons other than the court's failure to engage with the expert evidence. That being said, we note that the district court did not address the expert testimony in its evaluation of the summary judgment motions. We expect that upon remand, the expert testimony presented by the parties will be appropriately addressed, including any objections to the admissibility of that testimony.

18

In determining whether excessive force was used, we consider the facts "from the perspective of a reasonable officer on the scene," without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 397. Therefore, while we do not consider the officer's "intent or motivation," *Jones*, 325 F.3d at 527 (quoting *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996)), we ask "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force," *Elliott*, 99 F.3d at 642 (citing *Graham*, 490 U.S. at 396–97). In answering this question, we consider several factors, including "the severity of the crime at issue," whether the "suspect pose[d] an immediate threat to the safety of the officers or others," and whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Jones*, 325 F.3d at 527. We also consider the extent of the plaintiff's injuries. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Ultimately, we must decide "whether the totality of the circumstances justifie[d] a particular sort of . . . seizure." *Smith*, 781 F.3d at 101 (omission in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

Here, Hupp alleges that Trooper Cook used unlawful force against her by "grabbing and throwing" her to the ground and "pushing her against the police car." J.A. 25. We first dispense with Hupp's argument that because she was unlawfully arrested, the use of *any* force was necessarily unconstitutional. Certainly, we may consider any lack of probable cause for the arrest as we evaluate the reasonableness of the force used. But we consider the crime that is alleged to have been committed in connection with our overall analysis of *all* of the circumstances surrounding the use of force. *See Graham*,

19

490 U.S. at 396; *Jones*, 325 F.3d at 528–31 (explaining that the lack of any crime committed by plaintiff weighed heavily in favor of plaintiff's excessive force claim but nonetheless evaluating remaining *Graham* factors).

Moreover, we do not make any determination as to whether Hupp's arrest was actually unlawful. Our finding that Trooper Cook is not entitled to qualified immunity on the false arrest claim at this stage of litigation does not preclude a finding at a later stage that he lawfully arrested Hupp; a trier of fact could resolve the factual disputes that currently exist in Trooper Cook's favor. Therefore, we cannot agree with Hupp that our evaluation of the grant of qualified immunity on the excessive force claim turns entirely on any lack of probable cause for her arrest. Instead, we evaluate the totality of the circumstances surrounding the use of force against her.

In evaluating those circumstances, we note that the extent of Hupp's injuries is slight. The complaint alleges that Hupp suffered emotional trauma, including anxiety and an inability to sleep, as well as physical injuries. According to her medical records, Hupp suffered from middle and lower back pain and was diagnosed with a contusion and lumbosacral strain two days after the incident with Trooper Cook. J.A. 543–44. The record contains no additional evidence of injury. There is no evidence of serious or permanent physical injuries. *Cf. Rowland*, 41 F.3d at 172, 174 (finding extent of injuries significant where plaintiff suffered torn ligament in his leg, underwent two surgeries, and remained permanently partially disabled).

Hupp's minor injuries, however, are "but one 'consideration in determining whether force was excessive.'" *E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 185

20

(4th Cir. 2018) (quoting *Jones*, 325 F.3d at 530).  Other factors call into question the reasonableness of the use of force against Hupp.  First, the severity of the crime for which she was arrested is slight:  obstruction is a misdemeanor.  *See* W. Va. Code § 61-5-17(a).  When the offense is a "minor one," we have found "that the first *Graham* factor weighed in plaintiff's favor."  *Jones*, 325 F.3d at 528 (citations omitted).  We see no reason to find otherwise here.

Second, the evidence suggests that Hupp did not "pose[ ] an immediate threat to the safety of the officers or others."  *Graham*, 490 U.S. at 396; *Jones*, 325 F.3d at 528.  The district court found that this factor weighed in favor of qualified immunity, as Hupp positioned herself between Trooper Cook and Buddy, "which could reasonably be construed as hindering Cook's ability to protect himself."  J.A. 620.  A review of the record, however, suggests otherwise.  Hupp is a slender, short, 113-pound female.  Trooper Cook, on the other hand, weighs 200 pounds, is a trained police officer, and had undergone training in how to identify and handle aggressive dogs months before Hupp's arrest.  Trooper Cook was armed, had his gun drawn, and the video shows that Hupp approached him with her arms down and hands visibly empty.  Hupp stood perpendicular to Trooper Cook, did not place herself directly in front of him or his drawn gun, and it was only after Trooper Cook grabbed her arm that she moved in front of his weapon.  In light of these facts, we cannot agree with the district court that, as a matter of law, Hupp posed a sufficient threat to tip the scale in Trooper Cook's favor.  *See Smith*, 781 F.3d at 102 (finding that second *Graham* factor weighed in favor of section 1983 plaintiff where plaintiff was a "smaller woman," officer was "a pretty good size man" as a "200-

21

something-pound man," and officer had no reason to believe that the plaintiff was armed); *see also Rowland*, 41 F.3d at 174 (finding "no threat to the officer or anyone else" where plaintiff was not armed, officer did not suspect plaintiff was armed, and there was no "real evidence that this relatively passive, retarded man was a danger to the larger, trained police officer").

Third, there is disputed evidence of Hupp's resistance to arrest. The video depicts a brief struggle between Hupp and Trooper Cook lasting mere seconds after he grabbed her arm and before she fell to the ground. Trooper Cook grabbed Hupp's arm mere seconds after she approached him and, according to Hupp, before she had the opportunity to hear any order that he may have given for her to move. She testified that her reaction after having her arm seized was to try to put her arms up in surrender. J.A. 123. We have held that a reasonable officer could not believe that the "initial act of pulling [one's] arm away" when an officer grabs a person "without warning or explanation" justifies the officer's decision to throw the person to the ground. *Smith*, 781 F.3d at 103.

Trooper Cook, on the other hand, testified that Hupp took a "fighting stance" with him and that he "stiff armed" her in order to holster his weapon. J.A. 219, 571. Trooper Cook also testified that immediately before Hupp fell to the ground, she grabbed his clothing and cursed at him.[8] On these disputed versions of the facts, and in light of the other *Graham* factors that are unfavorable to Trooper Cook, we cannot say that a

[8] Hupp's alleged grabbing of Trooper Cook is not captured in the video because she allegedly did so when his back was turned to the camera and blocking the camera's view of Hupp.

reasonable officer would consider Trooper Cook's use of force reasonable under the circumstances. *See Rowland*, 41 F.3d at 174 (concluding that disputed versions of plaintiff's resistance combined with other "unfavorable" *Graham* factors precluded qualified immunity on excessive force claim).

### 3. Malicious Prosecution

We next address Hupp's section 1983 malicious prosecution claim. A malicious prosecution claim brought under section 1983 "is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Evans v. Chalmers*, 703 F.3d 636, 646 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)); *see Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 919 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment."). To prove such a claim, a plaintiff must show "that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans*, 703 F.3d at 647.

There is no dispute here that Hupp was arrested, prosecuted, and acquitted. What is disputed is whether probable cause existed for Hupp's prosecution. On this point, the district court determined that probable cause existed for Hupp's arrest and that the magistrate's subsequent finding of probable cause rendered Hupp's prosecution reasonable. J.A. 624. To be sure, we have held that "[o]nce a pretrial seizure has been rendered reasonable by virtue of a probable cause determination by a neutral and

23

detached magistrate, the continuing pretrial seizure of a criminal defendant—either by detention or by bond restrictions—is reasonable." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 184 (4th Cir. 1996). We later explained, though, that a finding of probable cause by a neutral magistrate only "weigh[s] heavily *toward* a finding that [the defendant] is immune" from suit. *Merchant v. Bauer*, 677 F.3d 656, 664 (4th Cir.) (quoting *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000)), *cert. denied*, 568 U.S. 1068 (2012). Thus, where a police officer takes certain steps, such as first conferring with a prosecutor about moving forward with a criminal prosecution, and a magistrate judge later affirms the officer's determination that probable cause exists for the prosecution, those steps weigh in favor of a finding of qualified immunity. They do not end the qualified immunity inquiry, however, as they "need only appropriately be taken into account in assessing the reasonableness of [the officer's] actions." *Id.* (internal quotation marks and citation omitted). A grant of qualified immunity still rests on our determination that an officer acted reasonably under the circumstances.

Because a magistrate's finding of probable cause is but a factor in our consideration of the overall reasonableness of the officer's actions, a defendant to a malicious prosecution claim is not absolved from liability when the magistrate's probable-cause finding "is predicated solely on a police officer's false statements." *Manuel*, 137 S. Ct. at 918. An officer who lies to secure a probable-cause determination can hardly be called reasonable. Likewise, where an officer provides misleading information to the prosecuting attorney or where probable cause is "plainly lacking," *McKinney v. Richland Cty. Sheriff's Dep't*, 431 F.3d 415, 419 (4th Cir. 2005), the

24

procedural steps taken by an officer no longer afford a shield against a Fourth Amendment claim. This is because "[l]egal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement." *Manuel*, 137 S. Ct. at 918–19.

Hupp contends that the magistrate's finding of probable cause does not afford Trooper Cook qualified immunity on her malicious prosecution claim because the probable-cause finding rested on false statements made by Trooper Cook in the criminal complaint against her. Specifically, Hupp asserts that the criminal complaint falsely stated, *inter alia*, that she refused to comply with Trooper Cook's orders to "step aside," began cursing at him, "raised her hands towards" him before he grabbed her arm, and then grabbed at him and "began cursing" after he grabbed her arm. J.A. 509; Opening Br. 18, 55.

We agree with Hupp that the district court's finding of qualified immunity on this claim was in error. As we have explained, disputes of fact preclude a finding at this stage that a reasonable officer would have believed that probable cause existed for Hupp's arrest. Those disputes relate to many of the facts set forth in the criminal complaint on which the magistrate relied. For example, there is a dispute as to whether Hupp refused to comply with Trooper Cook's orders for her to move or whether she was instead attempting to obey his order to control Buddy. There is also a dispute as to whether Hupp was cursing at Trooper Cook. Moreover, contrary to Trooper Cook's statement in the criminal complaint, the video clearly depicts Hupp's hands down at her side during

25

the entirety of the few seconds before Trooper Cook grabbed her arm. It was only after he grabbed her arm that she struggled, very briefly, with him.

If we excise the contested statements from the criminal complaint, the additional facts available to the magistrate do not, as the district court found, provide "ample evidence" for a probable-cause determination. J.A. 624. The district court emphasized the fact that Hupp "stepped in between the dog and the undersigned officer," which, according to the district court, showed that Hupp stepped in between Buddy and Trooper Cook as Trooper Cook was attempting to protect himself from the dog. J.A. 509, 624. However, in the criminal complaint, Trooper Cook also clearly stated that Buddy had "reached the end of the tether" and could not "reach" Trooper Cook. J.A. 509. Contrary to showing that Hupp interfered with Trooper Cook's ability to protect himself from Buddy, the complaint established that Trooper Cook knew Buddy was no longer a danger to him. No other basis for Hupp's alleged obstruction of Trooper Cook is identified in the complaint.

Given the disputes of the underlying historical facts, the supported assertion that Trooper Cook's statements in the criminal complaint were not entirely truthful, and the lack of undisputed evidence that otherwise would support a probable-cause finding, we cannot find that Trooper Cook is entitled to qualified immunity on Hupp's malicious prosecution claim under section 1983.

### 4. Common Law Malicious Prosecution

Trooper Cook's entitlement to immunity on Hupp's common law malicious prosecution claim fares no better. Under West Virginia law, a plaintiff bringing a

26

malicious prosecution claim must show "(1) that the prosecution was set on foot and conducted to its termination, resulting in plaintiff's discharge; (2) that it was caused or procured by defendant; (3) that it was without probable cause; and (4) that it was malicious." *Goodwin v. City of Shepherdstown*, 825 S.E.2d 363, 368 (W. Va. 2019) (citation omitted). Where a "want of probable cause for [the] prosecution is shown by a preponderance of the evidence," malice may be inferred. *Truman v. Fid. & Cas. Co. of N.Y.*, 123 S.E.2d 59, 68 (W. Va. 1961); *Morton v. Chesapeake & Ohio Ry. Co.*, 399 S.E.2d 464, 467 (W. Va. 1990).

The district court determined that, like with the section 1983 malicious prosecution claim, Trooper Cook is entitled to qualified immunity on the common law claim because probable cause existed for Hupp's arrest. The qualified immunity available against claims brought under section 1983 generally does not extend to common law claims. Nonetheless, West Virginia affords immunity "from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known." *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 762 (W. Va. 2014) (citation omitted). The state's qualified immunity doctrine borrows heavily from the analogous federal qualified immunity jurisprudence but also requires an additional finding that the defendant's alleged conduct not be "fraudulent, malicious, or otherwise oppressive" to the plaintiff. *Id.*; *Hutchison v. City of Huntington*, 479 S.E.2d 649, 659 (W. Va. 1996).

As discussed above, questions of fact exist that must first be resolved before a court can determine that a reasonable officer in Trooper Cook's position would have

27

believed that probable cause existed for Hupp's arrest and prosecution. Therefore, Trooper Cook is not entitled to immunity on Hupp's common law malicious prosecution claim, and the district court's grant of summary judgment is reversed.

*    *    *

To summarize, qualified immunity is appropriate at this stage only if there are no disputes of the historical facts underlying the false arrest, excessive force, and malicious prosecution claims. As we have explained, disputes exist. Those disputes must be submitted to a jury. The district court may then "reserve for itself the legal question of whether [Trooper Cook] is entitled to qualified immunity on the facts found by the jury." *Willingham*, 412 F.3d at 560.

## B.

We turn finally to Appellants' claims that Trooper Cook unlawfully entered Myers's home and unlawfully seized electronic devices from within the home. Under the Fourth Amendment, "searches and seizures inside a home without a warrant are presumptively unreasonable" and, thus, presumptively unconstitutional. *Payton v. New York*, 445 U.S. 573, 586 (1980); *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013). This rule is subject to "narrow and well-delineated" exceptions, *Yengel*, 711 F.3d at 396, one of which is when exigent circumstances justify the warrantless entry of a home, *Mincey v. Arizona*, 437 U.S. 385, 392–94 (1978). Exigent circumstances that may justify a warrantless entry include "the imminent destruction of evidence." *United States v. Brown*, 701 F.3d 120, 126 (4th Cir. 2012). That is, police officers may enter a home without a warrant when they "(1) have probable cause to believe that evidence of illegal

activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a search warrant." *United States v. Cephas*, 254 F.3d 488, 494–95 (4th Cir. 2001) (citing *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981)). Likewise, "[w]here law enforcement authorities have probable cause to believe that [property] holds contraband or evidence of a crime," warrantless seizure of the property is permitted under the Fourth Amendment "if the exigencies of the circumstances demand it." *United States v. Place*, 462 U.S. 696, 701 (1983).

Factors to be considered in determining whether exigent circumstances justify a warrantless entry include: "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband." *Turner*, 650 F.2d at 528. In evaluating these factors, courts consider "[t]he appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Reed*, 935 F.2d 641, 643 (4th Cir. 1991) (alteration in original) (citations omitted).

This case does not present the usual case for exigency; it does not involve a warrantless entry into a home to seize contraband that may be imminently destroyed. *See Cephas*, 254 F.3d at 495–96 (finding exigency where officer had probable cause to believe marijuana was inside apartment and would be destroyed if officer waited to secure warrant); *Brown*, 701 F.3d at 126–27 (finding exigency where probable cause

29

existed to believe that defendant had evidence of child pornography on computers at work that could be deleted before a warrant was obtained). Rather, this case involves a warrantless entry into a home to seize evidence that the police officer understood would *not* be destroyed. The video was taken by Hupp's husband, and Trooper Cook conceded that he believed Hupp's husband was glad to have the evidence and would not want to part with it. Ryan recorded the video as "[p]roof, if anything were to happen," for his wife's benefit. J.A. 160. That is, he believed that the video could exonerate his wife, not incriminate her. Thus, this case is unlike the "vast majority of cases in which evidence is destroyed by persons who are engaged in illegal conduct, [where] the reason for the destruction is fear that the evidence will fall into the hands of law enforcement." *Kentucky v. King*, 563 U.S. 452, 461 (2011).

### 1.

Appellants argue that the exigency test cannot be satisfied as a matter of law because there is no evidence that Ryan Hupp intended to destroy or conceal the video. Trooper Cook counters that there is evidence that Ryan intended to destroy or at least conceal the video from the police before a warrant could issue. According to Trooper Cook, Ryan was "glad to have" the video only *before* he realized that Trooper Cook wanted it. Resp. Br. 39 n.150. Trooper Cook points to evidence that after he entered the house and asked about the video, Ryan told him, "Don't worry. I deleted it. It was on this phone." J.A. 258. Additionally, another of Ryan's family members, Dalton, is heard on the video telling Ryan not to let the troopers know that Ryan was recording them.

30

Thus, Trooper Cook asserts, it was reasonable for him to believe that if he did not enter and seize the devices at that time, the evidence would be destroyed or concealed.

The evidence highlighted by Trooper Cook, however, is irrelevant to the exigency analysis. This is because the "existence of exigent circumstances must be determined as of the moment of the warrantless entry of the officers onto the premises." *Reed*, 935 F.2d at 643. Ryan's comments to Trooper Cook about deleting the video footage were made only after Trooper Cook had entered Myers's home and seized three of the electronic devices. According to Trooper Cook's own testimony, he stepped across the threshold into the home, asked Myers's family members that were in the house about the location of the video, received no response, began to seize electronic devices within sight, and only then did Ryan "step[ ] forward from back up the hallway" and tell Trooper Cook that he had deleted the video from his cell phone. J.A. 258–59. Similarly, Dalton's comments heard in the video were not made in Trooper Cook's presence; an officer would have heard those comments only after seizing the cell phone and watching the video. Thus, before Trooper Cook entered the home and began seizing the devices, his admitted understanding was that Ryan was happy to have the video footage and would not want to destroy it. Of course, we must determine whether a reasonable person in Trooper Cook's position would have believed that Ryan intended to destroy the video. On the facts presented to us, we see no reason to believe that an objective officer would have believed any differently than Trooper Cook did—that Ryan had recorded his wife's arrest, was happy about having recorded it, and would not want to delete that recording.

Trooper Cook's subjective understanding, however, is not the determinative factor. Rather, we must determine whether a reasonable officer in Trooper Cook's position would have believed that Ryan—or another of Hupp's family members present at the time—was likely to destroy or conceal the video. *See Reed*, 935 F.2d at 643. Based on the information available to an officer in Trooper Cook's position at the moment that he entered Myers's home, we cannot say as a matter of law that no reasonable officer would have believed that the video would be preserved while the troopers obtained a warrant. Having heard Ryan yell to his wife not to worry because he recorded her interaction with Trooper Cook, a reasonable officer could conclude, like Trooper Cook initially did, that Ryan was glad to have the video and would not destroy it. On the other hand, Hupp was believed to have committed a crime; the video documenting that crime was recorded by Hupp's husband; and a reasonable officer could have believed that, as Hupp's husband, Ryan would conceal or destroy the video evidence of her crime before handing it over to the police. We are thus hesitant to find that, as a matter of law, Trooper Cook unreasonably believed that the video was likely to be concealed before a warrant could issue. Instead, the question of whether such a belief was reasonable under the circumstances known to the officers at the time of Trooper Cook's entry into Myers's home must be submitted to a factfinder.

Turning to the other exigency factors, we note that there is no evidence regarding the time needed to secure a warrant. The record suggests, though, that there was little to no possibility of danger to the troopers if they stood guard while a warrant was secured. *See Turner*, 650 F.2d at 528. Trooper Cook testified that when he first approached

Myers's house, he saw Hupp and Lindsey with a "pistol crossbow" but saw no arrows and believed that Hupp and Lindsey "were playing with something with [*sic*] the creek" next to the house. J.A. 565–66. Trooper Cook did nothing to secure the crossbow and apparently did not consider it a threat; in fact, there is evidence that the crossbow was a broken plastic toy that belonged to Hupp's three-year-old son. J.A. 85, 128, 141. Buddy, the dog believed to be vicious, was tethered at the time of Hupp's arrest. And although the two troopers were outnumbered by Myers's family members, one of those family members was a toddler, another was pregnant, and there is no evidence that any of them were armed. Therefore, there does not appear to have been any danger to the troopers. *See Yengel*, 711 F.3d at 398 (finding no exigency when officer was informed that there was a grenade in house but other information available to officer indicated "stable nature of the threat"); *United States v. Whitehorn*, 813 F.2d 646, 649 (4th Cir. 1987) (affirming finding that exigency did not justify warrantless bomb sweep when there was no evidence "that anyone was evacuated from the building or warned of the potential danger, or that the agents had otherwise prepared for the risk of an exploding bomb"); *cf. Reed*, 935 F.2d at 642–43 (finding exigency where police officers saw sawed-off shotgun eighteen inches from man sleeping in a home where another man, known to carry firearms and with past arrests for assault and brandishing weapons, resided).

Nor was the video the only corroborating evidence of Hupp's alleged crime; Trooper Michael was also a witness, as were several of Hupp's family members. That fact, coupled with the minor crime for which Hupp was arrested, suggest that the level of urgency to obtain the video was not high. *See Welsh v. Wisconsin*, 466 U.S. 740, 750

(1984) ("Our hesitation in finding exigent circumstances . . . is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor.").

While these other factors weigh against a finding of exigency, a jury could nonetheless find that Trooper Cook reasonably believed that the video was at risk of being deleted or concealed. Therefore, we decline Appellants' invitation to find that Trooper Cook's entry into Myers's home and his seizure of the electronic devices were unreasonable as a matter of law. Instead, we remand for a trial to determine whether Trooper Cook's actions were reasonable.[9]

2.

We also take a moment to address Trooper Cook's view of the exigency exception to the warrant requirement. In an era in which cell phones are increasingly used to capture much of what happens in daily life, it is important to emphasize the limitations that the Fourth Amendment continues to place on a state's seizure of video evidence.

Trooper Cook testified that his regular practice is to seize any video recording that he believes to contain evidence of a crime he is investigating. J.A. 237–39. But the exigent-circumstances exception does not permit police officers to do what Trooper Cook routinely does: seize video evidence without a warrant even when there is no reason to

---

[9] Because we cannot say as a matter of law that an officer in Trooper Cook's position would reasonably have believed that the video evidence would be concealed or destroyed before a warrant for the video's seizure could be obtained, Trooper Cook is not entitled to qualified immunity on the search and seizure claims. *See Smith*, 781 F.3d at 100.

believe that the evidence will likely be destroyed or concealed. Such a rule would allow officers to seize as a matter of course video-recording devices from not just those involved in an incident, but also from neighbors and other curious bystanders who happen to record the events as they transpire. Under this view, police officers would lawfully be permitted to enter the home of every person living nearby who stands in her doorway or window recording an arrest, to seize her recording device, and to do so without a warrant or her consent—simply because video evidence, by its nature, can be easily deleted.

Such a view finds no support in our Fourth Amendment jurisprudence. While video evidence contained in a cell phone can be easily deleted or concealed, it is not merely the ease with which evidence may be destroyed or concealed that dictates exigency. An officer must also have reason to believe that the evidence will be destroyed or concealed. In short, adopting the broad definition of exigency urged by Trooper Cook would remove the exigent-circumstances exception to the warrant requirement from the class of "narrow and well-delineated" exceptions permissible under the Fourth Amendment. *Yengel*, 711 F.3d at 396. It would convert exigency from an exception to the rule.

IV.

For the foregoing reasons, we hold that the district court erred in granting summary judgment to Trooper Cook on the false arrest, excessive force, malicious prosecution, and unlawful entry and seizure claims. We also hold that the district court

35

properly denied Appellants summary judgment on the unlawful entry and seizure-of-devices claims. Accordingly, the district court's order denying Appellants' partial summary judgment motion on the search and seizure claims is affirmed and its order granting summary judgment to Trooper Cook is reversed. This matter is remanded to the district court for trial on each of Appellants' claims.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*